# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE MANGROVE PARTNERS MASTER FUND, LTD., AND 683 CAPITAL PARTNERS, LP, | § § § § | **CIVIL ACTION NO**: **1:20-CV-02290** |
| *Plaintiffs*, | § § § | |
| vs. | § § | **COMPLAINT** |
| NAVIOS MARITIME CONTAINERS L.P., | § § § | |
| *Defendant*. | | |

BRIAN KERR
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2500

OF COUNSEL:

DANNY DAVID (*pro hac vice* forthcoming)     NAVI DHILLON (*pro hac vice* forthcoming)
JUSTIN LIPE (*pro hac vice* forthcoming)       BAKER BOTTS LLP
BAKER BOTTS LLP                                101 California Street
910 Louisiana Street                           San Francisco, California  94111
Houston, Texas 77002                           (415) 291-6200
(713) 229-1234

## COMPLAINT

Plaintiffs The Mangrove Partners Master Fund, Ltd. ("Mangrove") and 683 Capital Partners, LP ("683 Capital," and together with Mangrove, "Plaintiffs") file this complaint against Navios Maritime Containers L.P. ("Defendant" or the "Partnership") and allege as follows:

## NATURE OF THE ACTION

1.      The Partnership is in the maritime shipping container business and solicited, in New York, an investment opportunity to Plaintiffs.  Defendant touted a specific business plan and convinced Plaintiffs to invest approximately $25 million.  Plaintiffs are among the larger investors in the Partnership.  Since making those investments in 2017, Plaintiffs have grown increasingly concerned about troubling decisions made by the Partnership and its management. The Partnership's Chairman of the Board, Angeliki Frangou ("Frangou"), has been the subject of criminal investigations and felony charges.  In addition, Frangou has approved sweetheart deals with other entities she owns or controls, on economic terms highly unfavorable to the Partnership.  For example, acting through the Board that she controls, Frangou recently amended an existing Management Agreement between the Partnership and one of her affiliated entities. That amendment increased the daily management fees paid by the Partnership to an amount far in excess of industry standards and added an entirely new termination fee that currently exceeds $50 million—nearly double the Partnership's current market capitalization.

2.      In December 2019, Plaintiffs sent a books and records demand asking for information regarding the business of the Partnership.  Plaintiffs sent a second request in February 2020 asking about criminal matters involving the Chairman of the Board, Frangou. The Partnership stonewalled both requests and has yet to produce a single document.

3.     The Partnership—formerly Navios Maritime Containers Inc. (the "Predecessor")—is one of a series of interconnected and affiliated shipping companies that each utilize the Navios brand.  The following diagram depicts these companies:



4.     Frangou is at the center of this web of entities.  She serves as the Chairman of the Board for every entity identified above, including the Partnership and its parent holding company, Navios Maritime Holdings Inc. ("Navios Holdings").  In addition, she serves as the Chief Executive Officer of each entity, with the exception of Navios South American Logistics Inc.  She is also the largest shareholder of parent company Navios Holdings, owning approximately 31% of its outstanding shares according to her most recent filing with the Securities and Exchange Commission.

5.      In this action, Plaintiffs—the second and third largest independent shareholders of the Partnership—seek to enforce their rights to inspect certain books and records pursuant to Section 32 of the Marshall Islands Limited Partnership Act and Section 3.4 of the Navios Maritime Containers L.P.'s Partnership Agreement dated November 30, 2018 (the "LP Agreement").

6.      For months, Plaintiffs have repeatedly asked for basic information concerning, among other things, the Partnership's operations, financial condition, and transactions with affiliated entities.  Plaintiffs offered to confer on multiple occasions by phone to streamline the process and assist in the copying and production of the requested records.  Defendant refused to confer by phone about streamlining the production process.

7.      The Partnership has taken the extreme position that Plaintiffs are not entitled to a single record because the Partnership believes Plaintiffs' request has no valid business purpose—despite the fact that Plaintiffs have invested millions of dollars in the Partnership and identified multiple discrete instances of self-interested, undisclosed, and unsupported Board actions.  The Partnership's troubling stance is at odds with applicable law and is nothing more than an unlawful effort to hide information from Plaintiffs.  For example, the Partnership refuses to allow inspection of the records that it is statutorily and contractually required to provide *irrespective of Plaintiffs establishing a proper purpose*, such as basic financial information and member lists under Section 3.4 of the LP Agreement.

8.      Even though the business purpose underlying Plaintiffs' request for select records should have been obvious to the Partnership, Plaintiffs nevertheless prepared a detailed letter outlining examples of why they sought certain information.  Plaintiffs identified specific

instances of apparent wrongdoing by Frangou and the Partnership's Board of Directors (the "Board"), such as:

    a.    Recklessly conducting a direct listing of the Partnership's shares on the NASDAQ stock exchange (the "Direct Listing")—in violation of prior material representations to investors, including Plaintiffs, and without shareholder approval—in order to trigger a conversion and impose a new, oppressive corporate governance structure on the Partnership and its shareholders.

    b.    After soliciting millions of dollars from Plaintiffs, orchestrating a scheme to strip fiduciary duty protections and entrench Frangou and her hand-selected cronies on the Partnership's Board in an effort to insulate Frangou and the Board that she controls from liability or challenge.

    c.    Wrongfully directing substantial financial and other resources belonging to the Partnership to various other companies under Frangou's control.

    d.    Failing to disclose material information—or, alternatively, making material misrepresentations—to investors, such as Frangou's apparent involvement in criminal matters.

9.    The Partnership's improper efforts to rob Plaintiffs of their inspection rights have only served to increase Plaintiffs' concerns regarding what Frangou and the Partnership are trying to hide—e.g., gross mismanagement, self-dealing, breaches of the LP Agreement, and breaches of legal duties owed to Plaintiffs. Standing alone, the fact that the Partnership refuses to provide any information regarding the criminal allegations involving Frangou is alarming.

10.    As large stakeholders in the Partnership, Plaintiffs seek books and records to learn more about the Partnership's business dealings and investigate or assess (i) potential wrongdoing, mismanagement, and possible breaches of legal duties by the Partnership's general partner, directors, and officers; (ii) the ability of the Board to impartially consider a demand for action to determine whether a pre-suit demand is necessary or would be excused prior to commencing derivative litigation on behalf of the Partnership; (iii) the projections, financial analyses, motivations, and approval processes underlying certain Board decisions in late 2018;

(iv) the Partnership's and Predecessor's apparent failures to disclose material information; and (v) mechanisms to prevent any additional damage to the Partnership resulting from actions taken by a controlling stockholder who has placed her own interests above those of the Partnership's minority stockholders. The documents sought through this action are necessary and essential to the purposes articulated by Plaintiffs.

11.     Plaintiffs seek an order directing the Partnership to produce books and records for inspection and copying.

## THE PARTIES

12.     Plaintiff The Mangrove Partners Master Fund, Ltd., a Cayman Islands exempted company, became a shareholder of the Partnership's Predecessor in 2017 and has continuously held Partnership stock (including its ownership interest in the Partnership's Predecessor, pre-conversion) at all relevant times. Mangrove's principal business place of business is New York, New York. Mangrove currently has millions of dollars invested in the Partnership.

13.     Plaintiff 683 Capital Partners, LP, a Delaware limited partnership, became a shareholder of the Partnership's Predecessor in 2017 and has continuously held Partnership stock (including its ownership interest in the Partnership's Predecessor, pre-conversion) at all relevant times. 683 Capital's principal place of business is New York, New York. 683 Capital currently has millions of dollars invested in the Partnership.

14.     Defendant Navios Maritime Containers L.P. is a Marshall Islands limited partnership. Defendant, through its agents, regularly conducts business in New York, including through related or controlled entities. The Partnership was originally formed as Navios Maritime Containers Inc., a Marshall Islands corporation, by parent company Navios Holdings in April 2017. In November 2018, the Predecessor was converted into the Partnership and all outstanding

common shares of the Predecessor were converted into common units of the Partnership, representing limited partner interests in the Partnership.  At the conversion ratio of one common share of the Predecessor to one common unit of the Partnership, an aggregate of 34,603,100 Partnership common units were outstanding after the conversion.  Since 2018, the Partnership's shares have been listed and traded on a stock exchange located in New York.

### VENUE AND JURISDICTION

15.     Venue is proper in this judicial district because a substantial portion of the transactions and wrongs complained of herein occurred in this district, including the Partnership's investment solicitations to Plaintiffs and others in connection with a private placement; execution of contracts underlying this dispute; numerous activities concerning the Partnership's efforts to pursue an initial public offering of the Partnership's shares; the subsequent completion of the Direct Listing of all the Partnership's outstanding shares, which are exclusively traded on the NASDAQ stock market located in New York, New York; and the Partnership's publicly facing securities representations concerning the Partnership, Navios Holdings, the conversion, and the contemplated public offering.

16.     Venue is also proper in this judicial district because the Partnership received substantial compensation by doing business here and engaging in significant investment solicitations in this jurisdiction.  In addition, the shares of the Partnership that are the basis for Plaintiffs' books and records demands are traded exclusively in this district.  Upon information and belief, some or all of the requested records are also located within this judicial district, including at offices of the Partnership's agents (e.g., Fried, Frank, Harris, Shriver & Jacobson LLP).

17.     For the same reasons cited in support of venue in this judicial district, this Court has personal jurisdiction (specific) over the Partnership with respect to the claims set forth herein.  In addition, the Partnership carries on a continuous and systematic part of its business in the State of New York.  For example, the Partnership maintains a registered agent for service of process, markets its business operations via a local New York contact and phone number and conducts business in an office located in Manhattan.

18.     Subject matter jurisdiction is proper under 28 U.S.C. section 1332 (diversity jurisdiction).

## FACTUAL BACKGROUND

**A.     Formation of the Predecessor Corporation.**

19.     The Partnership was originally formed on April 28, 2017 as Navios Maritime Containers Inc. by its parent company, Navios Holdings.  The Predecessor was a corporation formed under the laws of the Republic of the Marshall Islands.  Until late 2018, the Predecessor was registered and traded on the Norwegian OTC List marketplace.

20.     Following its formation, the Predecessor sought financing for the purchase of several container vessels through various private placements for an aggregate of 34,603,100 common shares in exchange for total proceeds of approximately $180.3 million (the "Private Placements").

21.     The Predecessor appointed Fearnley Securities AS as its bookrunner, and Fearnley Securities AS and S. Goldman Advisors LLC were jointly appointed as managers (the "Private Placement Managers") for the Private Placement.

22.     Beginning in May 2017, the Predecessor began actively marketing the Private Placement to potential investors, including Plaintiffs, which included road shows in New York.

23.     As part of the solicitation process, the Predecessor represented in New York to potential investors that the Predecessor's Board had resolved to pursue an initial public offering ("IPO") on a recognized stock exchange within twelve months of completing the Private Placements.  Upon consummation of the IPO, the Predecessor would be converted into a limited partnership.  Relying on these representations, Mangrove and 683 Capital have invested approximately $15 million and $10 million in the Partnership, respectively.

24.     In furtherance of these plans, on June 7, 2017, the Board unanimously adopted resolutions approving a plan to convert the Predecessor into a limited partnership organized under the laws of the Republic of the Marshall Islands upon the completion of an IPO (the "Plan of Conversion").

25.     The Plan of Conversion, which provided for conversion after completion of an IPO, was then submitted to and approved by the Predecessor's then-existing shareholders, which did not yet include outside investors (e.g., Plaintiffs).

26.     On the same day, the Predecessor entered into a variety of related party agreements, including (i) a management agreement dated June 7, 2017 (the "Management Agreement") with Navios Shipmanagement Inc. (the "Manager") pursuant to which the Manager provides commercial and technical management services for the Predecessor's vessels; and (ii) an administrative services agreement with the Manager to provide bookkeeping, audit and accounting, legal and insurance, administrative and clerical, banking and financial, advisory, client, investor relations, and other services.

27.     The initial Private Placement involving Plaintiffs closed on June 8, 2017 raising approximately $50.3 million in capital.

28.     In the months that followed, the Predecessor entered into a series of loan facilities and follow-on private placements to raise additional funds used to purchase containerships for the Partnership's fleet.

**B.     The Predecessor begins preparing for the contemplated initial public offering.**

29.     In March 2018, the Predecessor filed a Draft Registration Statement with the Securities and Exchange Commission, which expressly referenced the contemplated IPO.

30.     Between March and September 2018, the Predecessor filed four separate amendments to the Registration Statement—all of which contemplated an IPO, consistent with prior representations and approvals, and outlined the details surrounding the offering, including an anticipated IPO price of $19.00 per share.

**C.     Frangou and the Predecessor's Board violate their representations by unilaterally electing to proceed with a direct listing of the Predecessor's shares after a failed IPO attempt.**

31.     In or around October 2018, the Predecessor—led by Frangou and one or more of the directors she controlled—abruptly changed course, unilaterally setting aside the previously approved Plan of Conversion and IPO in favor of the Direct Listing on the NASDAQ stock exchange.  This decision ignored the shareholders' best interests, their objections (e.g., Plaintiffs'), and the prior representations made to investors in solicitations for the Private Placement.

32.     On the eve of the conversion and one day before filing the final Registration Statement, the Predecessor's Secretary, Vasiliki Papaefthymiou, executed an Amended and Restated Plan of Conversion to effectuate the Direct Listing in contravention of the Predecessor's longstanding representations and the shareholders' prior approvals.

33.     This course-reversal was never fairly or properly disclosed to the shareholders, much less submitted for approval.

34.     While the Amended Plan of Conversion states that the original Plan of Conversion was approved by all shareholders of the Predecessor, it then provides that the Board elected to unilaterally amend the Plan and the LP Agreement as it desired:

> The Board has determined that it is in the best interests of the Company that the listing of the Common Units and the Conversion be effected through an underwritten, primary issuance and sale of Common Units and, accordingly determined to amend and restate the Former Plan and to amend the related form of limited partnership to accommodate the underwritten, primary issuance and sale of Common Units and to effect certain desirable amendments.

35.     Upon information and belief, it appears the amendments were not properly considered and approved by the Board, notwithstanding the language in the Amended Plan of Conversion.   Alternatively, it appears any decision by the Board was tainted by bias and uninformed.   Among other things, Plaintiffs have asked for books and records concerning such transactions.

36.     Upon learning of the radical change to the Predecessor's contemplated offering, Mangrove expressed its opposition to the Direct Listing, forecasting the disastrous impact it would have on the Predecessor's share price.   Efforts by Mangrove and other stockholders to prompt the Board to consider alternatives and to consider the devastating harm that would result from the Direct Listing fell on deaf ears.

37.     Ignoring the warnings, the Frangou-led group proceeded with the Direct Listing and the conversion of the Predecessor's outstanding common shares into common units of the Partnership, which was formed as a Marshall Islands limited partnership.

38.     The devastating harm wrought by the decision to proceed with the Direct Listing—the very same harm that shareholders warned would result—is readily apparent from even a cursory look at the share price's performance, dropping 30% in the first week on the market and more than 50% in the first three months.   Plaintiffs objected to the Direct Listing

because the consequences of proceeding with the Direct Listing were obvious. Those objections were ignored and the predicted and obvious financial harm to the Partnership occurred.

39.     In connection with the conversion, the Board appointed Navios Maritime Containers GP LLC—an affiliated and wholly-owned subsidiary of Navios Holdings that is controlled by Frangou—to serve as the general partner of the Partnership (the "General Partner"). In addition, Frangou entrenched herself and her cohorts on the Partnership's Board and ensured, through the terms of the LP Agreement, that she would maintain firm control of the Partnership's activities moving forward.

**D.     The Direct Listing and conversion raise serious red flags.**

40.     While the Amended and Restated Plan of Conversion *claims* that it was accomplished with Board consent, it makes no mention of any Board resolutions or formal approval in support of the amendment. This stands in stark contrast to the original Plan of Conversion, which expressly identifies the measures taken to obtain approval. Nor does the Amended and Restated Plan of Conversion indicate that the Board of Directors ever performed any diligence to inform themselves regarding the significant harm associated with approving the ill-advised Direct Listing after the Predecessor's failed IPO.

41.     Because the Partnership has refused to provide even basic information, it is not even clear to Plaintiffs that the Board *ever* formally considered or approved the amendment to the Predecessor's Plan of Conversion or the election to move forward with the Direct Listing— much less, whether the Direct Listing was in the Predecessor's best interests or whether there were more attractive alternatives before consummating the Direct Listing.

42.     Plaintiffs raised this precise issue in their Letter Demands to the Partnership, questioning whether a Board resolution did, in fact, occur as the Predecessor has claimed. Not only did the Partnership refuse to produce responsive materials on that issue; the Partnership

offered no assurances or detail regarding the procedures, if any, that were actually followed. This silence speaks volumes.

**E.     The conversion was an unlawful scheme to entrench Frangou and the Board.**

43.     The Board's election to proceed with the Direct Listing and related conversion has conferred substantial benefits to Frangou, the Board, and the Partnership's affiliates—which are also controlled by Frangou—to the detriment of the Partnership's and Predecessor's shareholders.  For example, it appears that the sole purpose of the Direct Listing and the resulting conversion was to remove any accountability that Frangou and her Board constituents previously had by improperly restricting the duties owed through the 2018 conversion to a limited partnership and the adoption of self-serving provisions in the LP Agreement.  In other words, it appears the decision to move forward with the Direct Listing was designed to strip away minority protections and other legal duties to benefit Frangou at the expense of other shareholders.

44.     In connection with the conversion to a limited partnership, Frangou and the other directors prepared and revised the LP Agreement for the Partnership.  However, rather than maintain the standards and duties in effect under the prior governance structure, the directors breached their duties of loyalty by unilaterally injecting onerous and self-serving restrictions on the duties owed in furtherance of their personal interests.

45.     The fiduciary duties owed at all times prior to the conversion were relied on by investors, including Plaintiffs, when electing to participate in the Private Placements.

46.     Where, as here, a corporation enters into an agreement that will extinguish material potential liability for a controlling individual like Frangou, the individual has received a non-ratable benefit and, thus, must prove that the process and consideration surrounding the transaction were entirely fair and proper.  Yet, despite the clear conflict between the

Partnership's interests and those of Frangou and the directors she controls, the Board did nothing to protect the Partnership's interests and ensure that approval of the new terms was approved by a vote of *disinterested* and *independent* directors.  In fact, the restrictions at issue were not even disclosed to the shareholders.  To the extent that Frangou and the Board intended to remove or restrict the scope of the fiduciary duties in effect at the time they were soliciting the Private Placements, they had an obligation to disclose that material information to investors and failed to do so.

47.    Frangou and the rest of the Board also inserted a variety of provisions into the LP Agreement that effectively entrenched and transferred complete control of the Partnership to Frangou and her hand-selected constituents.   The Board accomplished this through LP Agreement provisions (i) allowing the General Partnership sole discretion over the appointment of three of the seven Board seats; (ii) providing that the remaining four directors would be elected *by a plurality* of the votes of the Outstanding Common Units, which ensured that Frangou and Navios Holdings would be able to select at least one of the four Elected Directors and guarantee Board control; and (iii) permitting the Elected Directors to be removed, at any time and without Cause, by the affirmative vote of a majority of the other members of the Board.

48.    The Board then ensured that the Partnership's shareholders could not unwind these onerous and oppressive restrictions by requiring the approval of *at least 90%* of the Outstanding Units to amend the provisions of the LP Agreement.

49.    There is no obvious or compelling business purpose for implementing the restrictions on fiduciary duties or the transfers of Board control to Frangou and the General Partner in the LP Agreement.  Rather, it appears that the primary motivation for the Direct Listing and related conversion was to significantly limit the duties and potential liability of

Frangou and the Board.  The lack of alternative justifications for the Direct Listing reinforces Plaintiffs' concerns that the Predecessor and its Board were not acting impartially, but rather served as a mere rubber stamp to Ms. Frangou's preferred transaction and desire to eliminate her potential exposure for the self-interested transactions that have followed.

**F.     Frangou is diverting Partnership assets to herself and her affiliated entities.**

50.     The Board's pervasive mismanagement, and the self-interested actions that contributed to the Predecessor's Direct Listing, have continued post-conversion.  For example, in connection with soliciting the investments of Mangrove and 683 Capital, the Predecessor stated that much of the Partnership's income would be paid to investors as dividends post-conversion, touting the preferred tax treatment for dividends in a partnership as the reason for the conversion.  However, while the conversion occurred more than a year ago, the Partnership has failed to issue any of the promised dividend payments to investors, and there was no reasonable basis to move forward with the Direct Listing.

51.     In addition, the Partnership has squandered assets by entering into expensive deals with affiliates controlled by Frangou, which contain outlier terms that are more favorable to the affiliates than industry standard.  Such conduct is especially alarming in light of the Partnership repeatedly touting to investors that its economies of scale result in "~5% lower operating expenditures than the industry."

52.     One of those deals is the Partnership's Management Agreement, pursuant to which the Partnership compensates the affiliated Manager for its provision of commercial and technical management services to the Partnership's vessels.   Although the Management Agreement requires that such services be provided in a commercially reasonable manner, the Partnership has siphoned off significant funds by charging inflated fees that are above standard industry rates and grossly exceed the "~5% lower operating expenditures than the industry"

promised to investors.  The Management Agreement further authorizes the Manager to subcontract certain commercial and technical management services to other Navios Holdings subsidiaries, enabling further abuse through subcontracts with additional Frangou affiliates. Under this payment scheme, an entity affiliated with Frangou received more than $53 million in daily rates 2018 alone, which does not even account for the various other amounts owed under the Management Agreement.

53.    Based on information and belief, the Partnership also appears to have compensated the Manager affiliate retroactively for a period predating the Management Agreement's execution by more than a month.  Specifically, the Partnership's public filings describe the Manager's fee as covering the period starting "April 28, 2017 (date of inception)," yet the Management Agreement containing these payment obligations was not even executed until June 7, 2017.

54.    Moreover, in August 2019, the Partnership increased the benefits being transferred to the Manager by entering into an amendment to the Management Agreement, despite the lack of *any* legitimate business purpose or justification to amend the agreement.  The term of the Management Agreement covered an initial period of five years *and included an automatic extension for five-year periods thereafter unless a notice for termination is received by either party*.  Thus, barring the Manager terminating the Management Agreement, it would have continued in perpetuity under its prior terms.  And even if termination were to occur, the Management Agreement's initial term was not set to expire for more than two years, on June 7, 2022.  Thus, in an act that can only be explained as blatant self-dealing, the Board approved an amendment to the Management Agreement that (i) extended the agreement, (ii) increased the

management fees owed by the Partnership, and (iii) injected an entirely new termination fee into the agreement.

55.     Not only has the amendment dramatically increased the Partnership's exposure in the event of termination; it provides for the payment of added fees that the Partnership was previously under no obligation to pay, resulting in the additional diversion of assets out of the Partnership.  While the Partnership was previously scheduled to pay a daily fee of US $6,100 for containerships from 3,000 TEU up to 5,500 TEU and $7,400 for containerships from 8,000 TEU up to 10,000 TEU, it now must pay, over the same-two year period, (a) $6,215 daily rate per Container vessel of 3,000 TEU up to 4,999 TEU—an increase of $125 per day; and (b) $7,780 daily rate per Container vessel of 8,000 TEU up to 9,999 TEU—an increase of $380 per day.  By contrast, the amendment conveys no meaningful consideration to the Partnership.

56.     The Partnership's conflicted decision to enter into an entirely unjustified amendment designed to exclusively benefit another of Frangou's entities constitutes an egregious violation of Frangou's, General Partner's, and the Board's fiduciary duties.  As a result of this self-dealing transaction, the Partnership will materially overpay for assets and services that were already committed to the Partnership through July 2022, while simultaneously imposing an entirely new termination fee on the Partnership equal to *an entire year's worth of Management fees*.  For reference, the Management fees paid in just the first nine months of 2019 totaled to $48.9 million.  By comparison, the Partnership's market cap as of March 12, 2020 was $31.409 million.   The net result will be a substantial and unjustified increase in the Partnership's obligations and transfer of wealth from the Partnership's investors to another Frangou-controlled entity.

57.     The Partnership has similarly contracted with other entities affiliated with and controlled by Frangou—for example, through an Administrative Services Agreement and an Omnibus Agreement.  Based on information and belief, these agreements likewise contain payment obligations and other provisions that are substantially more onerous on the Partnership than standard industry terms.  In order to fully assess the scope and extent of this practice of diverting Partnership assets through sweetheart deals, Plaintiffs must have access to the books and records requested in the Demand Letters.  The Partnership's refusal to allow inspection of such materials is therefore improper.

**G.     The Partnership is hiding information regarding criminal matters involving Frangou.**

58.     According to publicly available publications and based on information and belief, Frangou, the Partnership's Chief Executive Officer and Chairman of the Board, has been the subject of at least one criminal investigation in recent years, including an investigation by special corruption prosecutors that led to Frangou's bank accounts being frozen in or around November 2018—approximately one month before the Direct Listing and conversion.  Moreover, according to publicly available publications and based on information and belief, Greek authorities brought felony charges against Frangou in connection with an alleged money laundering racket and potential corrupt practices in 2016.  Incredibly, none of these matters—much less the criminal charges—were ever formally disclosed to Plaintiffs or, based on information and belief, the Partnership's other investors and shareholders.

59.     These criminal charges and investigations raise obvious and pressing concerns regarding Frangou's fitness to serve as a director and executive in the Partnership.  In addition, they raise material questions regarding the Board's impartiality, oversight functions, and compliance with the FCPA and other rules and regulations; the Partnership's removal of certain

fiduciary duties during its 2018 conversion; and the measures taken by the Board to investigate the allegations, if any.

**H.      Plaintiffs' Books and Records Demands.**

60.      On December 4, 2019, Plaintiffs' counsel served a demand letter on the Partnership's registered agent in New York seeking targeted information.   For example, Plaintiffs requested that the Partnership provide the following information:

  a.      Documents sufficient to show a complete record or list of the Partnership's unit holders, showing the name and address of each unit holder and the number of units registered in the name of each such unit holder (a) as of the date of this letter (the "Current Date"), and (b) as of November 30, 2018 (the "Conversion Date").

  b.      Copies of all written partnership agreements for the Partnership (including all exhibits and attachments thereto), all certificates of limited partnership for the Partnership, and all amendments to those documents.

  c.      With respect to the Partnership and any entities it controls or operates, any annual reports, audited or unaudited financial statements, and general ledgers.

  d.      With respect to the Partnership and any entities it controls or operates, all agreements or contracts involving any affiliates, including Navios Maritime Acquisition Corporation, Navios, Navios Maritime Partners L.P., Navios Maritime Midstream Partners, L.P., Navios South American Logistics, Inc., Special Purpose Vehicles Navios Europe I & II, Navios Maritime Holdings Inc., or Ms. Angeliki Frangou.

  e.      With respect to the Partnership, its General Partner, and the Predecessor, all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with any review, action, decision, vote, determination, or proposal concerning the conversion of the Predecessor into the Partnership.

  f.      With respect to the Partnership, its General Partner, and the Predecessor, all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with any review, action, decision, vote, determination, or proposal concerning the listing of equity interests in the Partnership on the NASDAQ or any other exchange through any method other than an IPO ("Direct Listing"), including any materials provided or

prepared by investment banks or financial advisors and proposed engagement terms or underwriting fees for a Direct Listing.

g.   With respect to the Partnership, its General Partner, and the Predecessor, all documents or correspondence concerning payments of distributions or dividends by the Partnership to any limited partners, unit holders, or affiliates of the Partnership or any shareholders or affiliates of the Predecessor.

61.   A true copy of Plaintiffs' demand letter dated December 4, 2019 is attached hereto as **Exhibit A** and incorporated herein by reference.

62.   Given the limited time period involved, Plaintiffs' requests will not result in any undue burden on the Partnership.  Nevertheless, before filing suit, Plaintiffs offered to address any issues concerning any undue burden but the Partnership never raised any such concerns and instead objected because it claimed there was no basis for seeking the information.

63.   By letter dated December 12, 2019, the Partnership, through its New York counsel, refused to comply with Plaintiffs' demand for inspection.

64.   On January 13, 2020, in an effort to avoid litigation and at the request of the Partnership, Plaintiffs served a second letter to the Partnership detailing examples of the factual circumstances supporting Plaintiffs' concerns about the Partnership's mismanagement and breaches of legal duties.

65.   By letter dated January 27, 2020, the Partnership again rejected Plaintiffs' demand for inspection, refusing to provide a single document in response.

66.   On February 19, 2020, Plaintiffs sent a third letter to the Partnership seeking information concerning certain criminal matters involving the Partnership's CEO and Chairman of the Board, Frangou and requesting that the Partnership produce documents relating to:

a.   Criminal investigations, allegations, or charges brought against Angeliki Frangou or any entities owned by, in whole or in part, or affiliated with Angeliki Frangou from January 2015 to the present (collectively, the "Criminal Matters").

b.    With respect to the Partnership, its General Partner, or Navios Maritime Containers, Inc., all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with or relating to any review, action, decision, vote, resolution, determination, or proposal concerning the Criminal Matters.

67.    A true copy of Plaintiffs' demand letter dated February 19, 2020 is attached hereto as **Exhibit B** and incorporated herein by reference.

68.    On March 3, 2020, six days after the Partnership's response deadline had expired and after Plaintiffs were forced to send another letter prompting a response, the Partnership sent a letter categorically refusing to produce any materials responsive to Plaintiffs' third demand letter or any of the requests previously submitted.

69.    Plaintiffs' counsel also had multiple conversations with counsel for the Partnership and repeatedly asked to discuss the documents demands to address any issues regarding scope or burden.  The Partnership refused to discuss the documents by phone and instead tried to delay the process.

**I.    Compliance with Demand Requirements.**

70.    The Demand Letters complied with the form and manner requirements under the Marshall Islands Limited Partnership Act and the LP Agreement.  The Demand Letters were made under oath, included proof of Plaintiffs' beneficial ownership of Partnership interests and were signed under oath.

71.    Moreover, the Demand Letters set forth proper purposes reasonably related to Plaintiffs' interests as limited partners of the Partnership.  Specifically, the Demand Letters state eight proper purposes, each of which is valid:

a.    Investigating potential wrongdoing, mismanagement, and breaches of fiduciary duties by members of the Board, executive officers, the General Partner, and others in connection with the events, circumstances, and transactions described above;

b.   Investigating the scope and extent of the conflicts of interest that may have contributed to the events, circumstances, and transactions described above;

c.   Valuing the Partnership and its respective units;

d.   Determining whether the Amended and Restated Plan of Conversion and Direct Listing were properly presented to the Board for approval and, if so, whether the Board issued formal approval and properly discharged its duties of due care and loyalty in considering those actions;

e.   Valuing the synergies and relative benefits to the Partnership's affiliates and related companies that resulted or was forecasted from the Predecessor's use of a Direct Listing;

f.   Assessing the ability of the Partnership's Board to consider, impartially, a demand for action (including a request for permission to file a derivative lawsuit on the Partnership's behalf) related to the items described in the Demand and this response letter;

g.   Performing the appropriate actions in the event that the members of the Board did not properly discharge their fiduciary duties, including the preparation and filing of a stockholder lawsuit; and

h.   Investigating the determinations, if any, by the Predecessor, the Partnership, the Board, executive officers, the General Partner, any committee or sub-committee, or others concerning whether the Conversion, Amended and Restated Plan of Merger, or Direct Listing were fair to and in the best interests of the relative constituencies including the Predecessor, its shareholders, the Partnership, and its converted unitholders, as well as the basis for such determinations.

72.   In short, there is ample basis to support Plaintiffs' books and record demands. The Board's misguided decisions and lack of diligence associated with pursuing the Direct Listing, the Board's disregard of the shareholder-approved Plan of Conversion and breach of the Predecessor's representations to potential investors, and Frangou's and the General Partner's continued mismanagement post-conversion, including the use of self-interested deals through which the Partnership's assets are being diverted into affiliated entities, all support the conclusion that serious concerns exist regarding mismanagement of the Partnership, which justifies further investigation into the matters specified in Plaintiffs' Demand Letters.

73.     Moreover, the discrete categories of documents requested by Plaintiffs directly relate to Plaintiffs' proper purposes for inspection.  For example, with respect to their proper purpose of investigating the scope and extent of the Partnership's and Board's conflicts of interest, Plaintiffs seek copies of the Partnership's agreements with affiliated entities and documents concerning payments to affiliates or shareholders of affiliates.  With respect to the proper purpose of investigating whether the Board properly and impartially determined that the Conversion, Amended Plan of Conversion, or Direct Listing were fair to and in the best interests of the Predecessor and its shareholders, Plaintiffs seek the materials reviewed, considered, or relied upon by the Board's directors concerning those matters.  With respect to their proper purpose of valuing their interests, Plaintiffs seek the Partnership's financial statements and general ledgers.  In sum, each of the categories of information sought by Plaintiffs is narrowly tailored to a proper purpose and should be made available by the Partnership.

74.     Accordingly, Plaintiffs seek an order requiring the Partnership to produce all of the requested documents so that Plaintiffs can, among other things, properly evaluate the suitability of directors, the Board's prior conduct (including any wrongdoing or mismanagement), the criminal allegations involving Frangou, the Board's diligence and decisions regarding those criminal allegations and the various transactions described herein, and communicate about those issues with other Partnership investors.

## COUNT 1:  COMPEL INSPECTION OF BOOKS AND RECORDS
(Breach of Section 3.4 of the LP Agreement and Section 32 of
the Marshall Islands Limited Partnership Act)

75.     Plaintiffs repeat and incorporate each and every allegation set forth above as if fully set forth herein.

76.     Plaintiffs—both of which are limited partners of the Partnership and have been unit holders of the Partnership and its Predecessor at all times relevant to the allegations and

claims in this Complaint—made demands to inspect certain books and records of the Partnership for purposes reasonably related to their interests as limited partners.

77. Pursuant to Section 3.4 of the LP Agreement, Plaintiffs are entitled to review the Partnership's books and records upon written request stating any purpose reasonably related to Plaintiffs' interests as unit holders of the Partnership.

78. Section 3.4 of the LP Agreement provides, in relevant part, that:

(a) In addition to other rights provided by this Agreement or by applicable law, and except as limited by Section 3.4(b), each Limited Partner shall have the right, for a purpose reasonably related to such Limited Partner's interest as a Limited Partner in the Partnership, upon reasonable written demand and at such Limited Partner's own expense, to:

(i) have furnished to him a current list of the name and last known business, residence or mailing address of each Partner;

(ii) obtain true and full information regarding the amount of cash and a description and statement of the Net Agreed Value of any other Capital Contribution by each Partner and which each Partner has agreed to contribute in the future, and the date on which each became a Partner;

(iii) have furnished to him a copy of this Agreement and the Certificate of Limited Partnership and all amendments thereto, together with a copy of the executed copies of all powers of attorney pursuant to which this Agreement, the Certificate of Limited Partnership and all amendments thereto have been executed;

(iv) obtain true and full information regarding the status of the business and financial condition of the Partnership Group; and

(v) obtain such other information regarding the affairs of the Partnership as is just and reasonable.

     (b)     The Board of Directors may keep confidential from the Limited Partners, for such period of time as the Board of Directors deems reasonable,

          (i)     any information that the Board of Directors reasonably believes to be in the nature of trade secrets or

          (ii)     other information the disclosure of which the Board of Directors in good faith believes (A) is not in the best interests of the Partnership Group, (B) could damage the Partnership Group or (C) that any Group Member is required by law or by agreement with any third party to keep confidential (other than agreements with Affiliates of the Partnership the primary purpose of which is to circumvent the obligations set forth in this Section 3.4).

LP Agreement § 3.4.

79.     Pursuant to Section 32 of the Marshall Islands Limited Partnership Act, Plaintiffs are similarly entitled to review the Partnership's books and records upon written request, stating any purpose reasonably related to Plaintiffs' interests as unit holders of the Partnership.

80.     Section 32 of the Marshall Islands Limited Partnership Act provides, in relevant part, that:

> Each limited partner has the right, subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners, to obtain from the general partners from time to time upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner: (i) true and full information regarding the status of the business and financial condition of the limited partnership; (ii) promptly after becoming available, a copy of the limited partnership's financial statements or income tax returns, if applicable, for each year; (iii) a current list of the name and last known business, residence or mailing address of each partner; (iv) a copy of any written partnership agreement and certificate of limited partnership and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the partnership agreement and any certificate and all

amendments thereto have been executed; (v) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each partner and which each partner has agreed to contribute in the future, and the date on which each became a partner; and (vi) other information regarding the affairs of the limited partnership as is just and reasonable.

Marshall Islands Limited Partnership Act § 32(2)(a).

81.     The Marshall Islands Limited Partnership Act further provides that it "shall be applied and construed to make the laws of the Marshall Islands, with respect to the subject matter hereof, uniform with the laws of the State of Delaware of the United States of America" and that "[i]nsofar as it does not conflict with any other provision of this Act, or the decisions of the High and Supreme Courts of the Republic of the Marshall Islands which takes precedence, the nonstatutory law of the State of Delaware is hereby adopted as the law of the Marshall Islands." *Id.* § 66(5).

82.     The documents identified in the Demand Letters fall within the scope of Section 3.4 of the LP Agreement and Section 32 of the Marshall Islands Limited Partnership Act, and Plaintiffs have complied fully with all requirements under both the LP Agreement and the Marshall Islands Limited Partnership Act concerning the form and manner of making a demand for inspection of the Partnership's books and records.

83.     Through their Demand Letters, Plaintiffs have identified a credible basis from which to infer that there are reasonable grounds to suspect mismanagement that warrants further investigation.  Plaintiffs' Demand Letters stated purposes reasonably related to their interests as unit holders of the Partnership, and the documents identified therein are essential for that purpose.  In addition, Plaintiffs have offered to pay any reasonable, statutorily prescribed costs associated with their demands.

84.     The Partnership has wrongfully, and in bad faith, refused to provide Plaintiffs access to *any* of the books and records requested in their Demand Letters, depriving Plaintiffs of their inspection rights and in the process breaching the LP agreement and violating the Marshall Islands Limited Partnership Act.

85.     Plaintiffs are therefore entitled to apply to this Court for an order compelling inspection of the Partnership's corporate books and records.

86.     Plaintiffs seek an order based on Section 3.4 of the LP Agreement and Section 32 of the Marshall Islands Limited Partnership Act directing the Partnership to produce the requested records.

87.     Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of judgment as follows:

A.     A judicial declaration declaring that Defendant violated Plaintiffs' statutory rights under Section 32 of the Marshall Islands Limited Partnership Act by failing to provide the documents and information requested by Plaintiffs' Demand Letters;

B.     A judicial declaration that Defendant breached Section 3.4 of the LP Agreement by failing to provide the documents and information requested by Plaintiffs' Demand Letters;

C.     An order requiring the Partnership or its General Partner to promptly permit the inspection and copying of true copies of the requested books and records as set forth in Plaintiffs' Demand Letters and this Complaint;

D.     An order directing the Partnership to pay Plaintiffs' reasonably incurred fees and costs in connection with this litigation; and

E.     Such other and further relief as this Court deems just and proper.

DATED:  March 13, 2020

Respectfully submitted,

BAKER BOTTS LLP


By: */s/ Brian Kerr*_____
    BRIAN KERR
Attorney for Plaintiffs THE MANGROVE
PARTNERS MASTER FUND, LTD., and
683 CAPITAL PARTNERS, LP