**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE MANGROVE PARTNERS MASTER FUND, LTD., and 683 CAPITAL PARTNERS, LP,<br><br>Plaintiffs,<br><br>vs.<br><br>NAVIOS MARITIME CONTAINERS L.P., ANGELIKI FRANGOU, and DOES 1-10,<br><br>Defendants. | **CIVIL ACTION NO**: **1:20-CV-02290**<br><br><br>**FIRST AMENDED COMPLAINT FOR FRAUD AND BREACH OF LIMITED PARTNERSHIP AGREEMENT**<br><br><br>**JURY TRIAL DEMANDED** |

BRIAN KERR
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2500
brian.kerr@bakerbotts.com

OF COUNSEL:

DANNY DAVID (*pro hac vice* forthcoming)
SCOTT KELLER (*pro hac vice* forthcoming)
EVAN A. YOUNG (*pro hac vice* forthcoming)
JUSTIN LIPE (*pro hac vice* forthcoming)
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234

NAVI SINGH DHILLON (*pro hac vice* forthcoming)
BAKER BOTTS LLP
101 California Street
San Francisco, California 94111
(415) 291-6200

*Counsel for Plaintiffs*

Plaintiffs The Mangrove Partners Master Fund, Ltd. ("Mangrove") and 683 Capital Partners, LP ("683 Capital," and together with Mangrove, "Plaintiffs") file this first amended complaint against Defendants Navios Maritime Containers L.P. ("Navios Containers" or the "company"), Angeliki Frangou ("Frangou"), and Doe Defendants 1-10 (together with Navios Containers and Frangou, "Defendants") and allege as follows:

## THE CONTROVERSY

1.       Defendant Frangou orchestrated a fraudulent scheme by first inducing Plaintiffs to make substantial outside investments in one of Frangou's companies, Navios Containers, and then harming Plaintiffs and the company by deceptively eliminating fiduciary-duty protections and diverting millions of dollars to other companies affiliated with Frangou.

2.       Defendants' fraudulent scheme hid from Plaintiffs the purported existence of a "Plan of Conversion," through which Defendants eliminated fiduciary-duty protections for Navios Containers' shareholders when the company was listed on a public stock exchange. Plaintiffs have repeatedly asked for a copy of that purported Plan of Conversion, but Defendants nevertheless refuse to produce it—raising serious questions as to the whether any such plan ever existed.  Indeed, to this day, Plaintiffs have never seen that plan.

3.       Regardless of whether Defendants hid or subsequently manufactured the Plan of Conversion, Defendants never disclosed their covert "Plan" to eliminate fiduciary-duty protections without investor approval while they were pitching private placements in Navios Containers to Plaintiffs—which ultimately resulted in Plaintiffs purchasing $25 million of stock in Navios Containers.  But now, Frangou and other conflicted insiders allege they entered into this "Plan" just one day before Plaintiff Mangrove closed its initial investment in Navios Containers—on June 8, 2017.

4.      Then after a failed IPO in 2018, Frangou jammed through a proposal to directly list Navios Containers on the Nasdaq stock exchange (the "Direct Listing").  And it was only after SEC filings made on November 30, 2018, that Plaintiffs actually saw a claimed "Amended and Restated Plan of Conversion," which was the first time Defendants provided any information regarding a purported Plan of Conversion adopted in June 2017.  Since the Direct Listing and among other things, Defendants have entered into artificially inflated and unreasonable agreements with affiliates controlled by Frangou, diverting millions of dollars to the other Frangou-controlled affiliates.

## THE SCHEME

5.      Frangou launched the fraudulent scheme in April 2017 when she formed Navios Containers, a Republic of the Marshall Islands ("RMI") corporation.  Frangou purportedly formed the company to raise millions of dollars to purchase a fleet of container ships.  Notably, RMI corporations are statutorily prohibited from eliminating certain key fiduciary duties, such as the duty of loyalty, duty to act in good faith, and duty to avoid transactions involving an improper personal benefit.

6.      A week later, in May 2017, Frangou visited Mangrove's New York office to pitch Plaintiff Mangrove on acquiring securities in Navios Containers.  Among other things, Frangou touted her experience and reputation, access to undervalued ships, and claimed the company quickly would turn profitable.  Frangou further claimed it was her "intent" to pursue an initial public offering ("IPO") at some unspecified date in the future and that her "preference" was to convert, again at some unspecified date in the future, the recently formed Navios Containers into an RMI limited partnership in connection with that future IPO listing.  As to the purpose of the

possible future conversion, Frangou claimed it would provide substantial tax benefits and an improved dividend structure.

7.      Frangou also touted her commitment to "investor accountability" and offered Mangrove a seat on Navios Containers' board of directors (the "Board"), stating she looked forward to having Mangrove's input on the future of the company.

8.      After Mangrove agreed to purchase stock in Navios Containers, Frangou and Navios Containers' other interested officers and directors delayed Mangrove's closing.  During that delay, on May 31, 2017, Navios Containers closed the remainder of the initial private placement with entities controlled by or affiliated with Frangou, leaving Mangrove as the only investor yet to close its position in the offering.

9.      As to Mangrove's promised Board seat, Defendants imposed conditions designed to discourage Mangrove from accepting the Board seat, including demanding an agreement that Mangrove concede its right to sue the company and its directors.  Mangrove expressed concern about the proposal and the treatment of minority shareholders.  Defendants assured Mangrove not to worry about the Board seat because the directors and officers of Navios Containers owed fiduciary duties to Mangrove, which would, in turn, ensure the protection of minority shareholders.  On *June 8, 2017*, in reliance on Defendants' representations, Mangrove invested millions of dollars in Navios Containers.

10.     In August 2017, Defendants went on another road show in New York to pitch a second private placement of stock in Navios Containers to Plaintiffs Mangrove and 683 Capital.  As before, Frangou made the same pitch, touting her experience and commitment to investor accountability and conveying that she merely had an "intention" to pursue an IPO at some unspecified date in the future and "preferred" an RMI partnership structure for tax reasons.  At

the time and as before, Navios Containers was an RMI corporation, and its directors and officers owed fiduciary duties to shareholders.  Defendants did not disclose any governance changes or Board actions since the time of the first private placement.  Relying on Defendants' representations, Mangrove and 683 Capital invested millions of dollars more in the company.

11.    In October 2017, Defendants pitched a third private placement of stock in Navios Containers to Plaintiffs, making similar representations as before (e.g., investor accountability, fiduciary-duty protections).  Moreover, this time around, the investor materials purported to identify each and every key event that had transpired since Navios Containers' formation—documenting each investment and financing round and vessel acquisition.  Yet Defendants did not disclose any governance changes or Board actions that occurred prior to the October 2017 private placement.  Again, relying on Defendants' representations, Plaintiffs invested millions of dollars more in the company.  Plaintiffs currently own approximately sixteen percent of Navios Containers.

12.    In October 2018, Defendants abandoned an IPO.  Defendants then moved forward with a so-called "Direct Listing" on a U.S. stock exchange (Nasdaq) without first obtaining shareholder approval.  Plaintiffs objected.  Defendants ignored those concerns and proceeded with the Direct Listing anyway, converting the company into a master limited partnership and stripping all fiduciary-duty protections for shareholders, like Plaintiffs, according to the purported Plan of Conversion that was supposedly approved a day before Plaintiff Mangrove's initial outside investment in June 2017.

13.    Navios Containers' stock price dropped ***thirty percent*** within a week of its initial listing on the Nasdaq exchange in December 2018, and it has since fallen even more due to Defendants' misconduct.  Among other things, Plaintiffs were damaged by Defendants' unlawful

stripping of fiduciary duties because the elimination of such valuable shareholder protections had a negative impact on the value of Navios Containers' stock.  In addition, Frangou is now funneling company assets to other entities under her control, which has resulted in further harm to Navios Containers and Plaintiffs.

14.     Defendants **hid or manufactured** a critical fact.  ***On June 7, 2017—exactly one day before*** Mangrove wired millions of dollars to Navios Containers to close the first private placement investment—Defendants now claim that the then-existing shareholders (all insiders) unanimously approved a "Plan of Conversion."  Defendants claim the purported Plan of Conversion allowed the Navios Containers Board to convert Navios Containers into a partnership *with no fiduciary duties*.

15.     Under RMI law, a plan of conversion requires approval by *all* shareholders.  Yet the Plan of Conversion purportedly provides that no future approval by persons who become shareholders after June 7, 2017, was required.

16.     At the same time Defendants were purportedly and secretly trying to adopt a Plan of Conversion that would rob Plaintiffs of fundamental stockholder protections, Defendants were assuring Mangrove that all shareholders would have fiduciary duty protections.  Defendants also assured Mangrove that, as one of the first investors, Mangrove would have an opportunity to weigh in as a stockholder on Defendants' "intentions" and "preferences."

17.     Defendants either hid or manufactured the existence of this Plan of Conversion because Defendants knew it was a material fact:  Mangrove would be able to block Defendants' efforts to strip fiduciary duties once it became a shareholder under RMI law.  And Defendants affirmatively represented to Mangrove that RMI law applied to Navios Containers.

18.     Defendants then doubled-down on their scheme by soliciting not one, but two more private placements.  In both instances, Defendants did not tell Plaintiffs about any plan of conversion.  That is striking, as Defendants now claim they purportedly adopted such a plan on June 7, 2017—again, exactly one day before Mangrove's first investment and months before the second and third private placements.

19.     On November 30, 2018, as noted, Defendants filed with the SEC a purported "*Amended and Restated* Plan of Conversion."  That filing revealed, for the first time, information regarding the Plan of Conversion purportedly adopted in June 2017.

20.     Since then, Navios Containers' shareholders have opposed and protested the events surrounding the Direct Listing, the conversion, and the subsequent transactions that are harming minority shareholders but benefitting Frangou.  For example, Defendants recently extended the term of an existing Management Agreement with a Frangou-controlled affiliate. The amendment was not only completely unwarranted, given the almost two years remaining on the existing term, but it also included a dramatic increase in the daily management fees paid by Navios Containers to an amount far in excess of industry standards.  And perhaps more troubling, the amendment to the Management Agreement imposes a new termination fee on Navios Containers that, if triggered, would currently exceed $50 million—*an amount almost twice Navios Containers' current market capitalization.*

21.     Since December 2019, Plaintiffs have asked Defendants to produce books and records concerning Navios Containers, including the purported Plan of Conversion.  Despite their contractual and statutory right to such records, Defendants have refused to produce a single document.

22.     By this action, Plaintiffs seek relief to address Defendants' fraud and related misconduct.

## THE PARTIES

23.     Plaintiff The Mangrove Partners Master Fund, Ltd., a Cayman Islands exempted company, became a shareholder of Navios Containers in 2017 and has continuously and at all times relevant held Navios Containers stock.  Mangrove's principal business place of business is New York, New York.  In response to the representations made by Defendants, Mangrove invested approximately $15 million in Navios Containers.

24.     Plaintiff 683 Capital Partners, LP, a Delaware limited partnership, became a shareholder of Navios Containers in 2017 and has continuously and at all times relevant held Navios Containers stock.  683 Capital's principal place of business is New York, New York.  In response to the representations made by Defendants, 683 Capital invested approximately $10 million in Navios Containers.

25.     Defendant Navios Maritime Containers L.P. is a Marshall Islands limited partnership and is currently listed under the Nasdaq Stock Exchange located in New York. Before its Nasdaq listing, Navios Containers' representatives (e.g., Frangou) traveled to New York to raise millions of dollars of funds from potential investors, including Plaintiffs.  Navios Containers owns and operates a fleet of container ships and has relationships with other entities affiliated with Frangou.  Navios Containers maintains a registered agent for service of process in New York, markets its business operations via a local New York contact and phone number and conducts business in an office located in Manhattan.

26.     Navios Containers is one of a series of interconnected and affiliated shipping companies that each utilize the Navios brand.  The following diagram depicts a subset of these companies, as represented by Frangou during the private placements:



27.     Defendant Frangou is at the center of this web of entities.  She serves as the Chairman of the Board for every entity identified above, including Navios Containers and its parent holding company, Navios Holdings.  In addition, she serves as the Chief Executive Officer of each entity, with the exception of Navios South American Logistics Inc.  She also is the largest shareholder of parent company Navios Holdings, owning approximately thirty-one percent of its outstanding shares according to her most recent filing with the Securities and Exchange Commission.  Upon information and belief, Frangou's United States address is 140 W 46th St., Apt. 6501, New York, NY 10019.

28.     Doe Defendants Nos. 1-10 are unnamed Navios Containers employees, officers, directors or other individuals or entities who participated and acted in concert with Defendants in their scheme to unlawfully defraud Plaintiffs, conceal material information, strip the fiduciary duties owed by Navios Containers' management, and siphon invested funds into affiliated entities.   Due to Defendants' wrongful refusal to comply with Plaintiffs' statutory and contractual information rights, Plaintiffs still have yet to learn the true names and identities of the Doe Defendants and the full nature and extent of their involvement in the fraudulent scheme and misconduct, which caused and continue to cause the damages alleged herein.

29.     All wrongful conduct detailed in this complaint was undertaken by or at the direction of Frangou and was undertaken by Frangou and any Doe Defendants in both their individual capacities and in their roles as employees, directors, managers, and/or officers of Navios Containers.

## VENUE AND JURISDICTION

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the federal securities laws.   *See* 15 U.S.C. § 78j(b).   This Court has supplemental jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367 because those claims are part of the same case or controversy.

31.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in this Judicial District.

32.     This Court has personal jurisdiction over Defendants with respect to the subject matter of this dispute because Defendants committed acts central to the scheme and fraud directly in the State of New York.   For example, Frangou personally traveled to New York City to solicit Plaintiffs to purchase securities in Navios Containers through a series of deceptive

misrepresentations and material omissions that Frangou made directly to Plaintiffs while in this Judicial District.  Additionally, upon information and belief, Defendant Frangou maintains a residence in New York and regularly conducts Navios Containers business in the State of New York.  Navios Containers also has submitted itself to the jurisdiction of courts located in New York in connection with its listing on the Nasdaq exchange; Navios Containers' SEC filings state:

> we have expressly submitted to the jurisdiction of the U.S. federal and New York state courts sitting in the City of New York for the purpose of any suit, action or proceeding arising under the securities laws of the United States or any state in the United States, and we have appointed C T Corporation System, 111 8th Avenue, New York, New York 10011 to accept service of process on our behalf in any such action.

*See* Navios Containers' Prospectus, filed pursuant to SEC Rule 424(b)(1), dated November 30, 2018, at 210 (Service of Process and Enforcement of Civil Liabilities).

## FACTUAL BACKGROUND

### A.    May 2017 Private Placement.

33.    On April 28, 2017, Navios Containers was registered as a Republic of the Marshall Islands corporation under the name Navios Maritime Containers Inc.  Frangou caused the entity to be formed through a holding company under her control, Navios Holdings.  In or around the same time, Frangou hand-selected each of Navios Containers' initial officers and directors.

34.    Beginning in May 2017, Navios Containers began actively marketing its initial private placement to potential investors, including Plaintiff Mangrove, which included road shows in New York.  On May 2, 2017, Navios Containers opened a private placement offering common shares of Navios Containers at the price of $5 per share. The securities were unregistered and offered for sale on a private placement basis under a claimed exemption to

section 4(a)(2) of the Securities Act of 1933 and Rule 506 of Regulation D promulgated thereunder.

35. In early May 2017, Frangou personally traveled to New York to raise up to $100 million for her newly formed company.

36. On May 3, 2017, Frangou met with Mangrove's representatives in New York, including Nathaniel August (Mangrove's Portfolio Manager).  During that in-person meeting, Frangou represented:

- Navios Containers' strategy was to invest in and acquire, manage and operate a fleet of maritime container assets and container vessels and position Navios Containers for an IPO.

- Navios Containers was formed as a Marshall Islands Corporation and subject to Marshall Islands laws, which meant that the directors of the company owed fiduciary duties to shareholders.

- Frangou had substantial experience in the maritime industry—industry contacts that were critical to the future of Navios Containers because they would provide below-market purchase opportunities and management rates, all of which would create a valuable package for a potential IPO twelve months in the future.

- Navios Containers would quickly make dividend distributions, and Frangou's preferred plan was to convert the company into a Marshall Islands limited partnership in connection with the contemplated IPO because it would create tax benefits.

- In response to Mangrove's questions about its ability to participate in the management of the company and minority shareholder rights, Frangou promised Mangrove one of six seats on Navios Containers' Board of Directors and referenced the fiduciary duties owed by directors and officers to Maritime Containers' shareholders.

37.     In furtherance of their investment solicitations, Defendants also prepared and issued Private Placement Investment Materials (collectively, the "May 2017 Investor Materials"), which consisted of the following:

- a Private Placement Application Agreement;

- the Term Sheet for Private Placement of Navios Containers; and

- the May 2017 Navios Containers Investor Presentation, USD 70 – 100 million Equity Private Placement.

38.     The May 2017 Investor Materials likewise disclosed that Navios Containers was a Marshall Islands Corporation and tracked the representations made by Frangou during the in-person meeting.  For example, the May 2017 Investor Materials contained representations:

- Praising Navios Containers' "Governance and transparency," citing a "[l]ong track record of financial reporting, compliance and *investor accountability in public markets*";

- Citing "[m]ultiple efficient paths to liquidity," including "[r]eturning capital to shareholders through distributions";

- Touting Navios Containers' management team, which included four independent directors (out of six total seats), including an "investor appointee";

- Representing that Navios Containers' affiliate relationships would result in "[o]perating costs significantly lower than average due to in-house operations";

- Claiming "[c]ommercial and technical management" at rates approximately "5% below the industry average."

39.     The May 2017 Investor Materials did not disclose that any plan of conversion had been approved or adopted by the shareholders or that investors such as Mangrove would be subject to any plan of conversion.  Nor did the May 2017 Investor Materials disclose that Defendants planned to eliminate any fiduciary duties.  To the contrary, Frangou represented the exact opposite.

40.     Consistent with the representations made by Frangou, the May 2017 Investor Materials communicated that any conversion would occur, if at all, in the future.  Navios Containers' future was still developing, and Mangrove would have an opportunity to participate in those plans.  For example, the May 2017 Investor Materials provided that there was an "*[i]ntention* to list on a reputable stock exchange within 12 months."  Those materials further provided that Navios Containers at the time merely "***preferred***" a master partnership structure. Defendants did not disclose that they were drafting or actively considering any particular master partnership agreement, much less that they had approved or were in the process of approving any master partnership agreement.

41.     Based on Frangou's representations and the May 2017 Investor Materials, Mangrove understood that Defendants were soliciting Mangrove to become one of the initial shareholders in Navios Containers, that Mangrove would have an opportunity to influence—as both a shareholder and a member of the Board—on the future plans proposed by Defendants, and that minority shareholders would be protected by fiduciary duties in accordance with Marshall Islands law, which generally tracks Delaware law on corporate and fiduciary duty matters. Relying on Defendants' representations, and by extension these understandings, Mangrove agreed to participate in the May 2017 private placement.

42.     On May 11, 2017, Navios Containers' agent, Fearnley Securities ("Fearnley"), informed Mangrove that the May 2017 private placement application period had closed and that Mangrove would receive $20 million worth of Navios Containers shares through the initial private placement, as well as a seat on the Board.

43.     As of May 22, 2017, Mangrove was still waiting for Defendants to complete the private placement and was concerned about Navios Containers' ongoing delay of Mangrove's

closing date, especially given Frangou's prior representations about the need to quickly close on the deal.  On May 22, 2017, Mangrove sent an e-mail to Defendants inquiring about the status of the Board seat and the closing.

44.     On May 22, 2017, Navios Containers' Chief Financial Officer, Chris Christopoulos, contacted Mangrove to inform Mangrove that Navios Containers' General Counsel and Corporate Secretary, Vasiliki Papaefthymiou, would be contacting Mangrove to assist with the process.  On May 25, 2017, Papaefthymiou sent an e-mail explaining that Navios Containers' legal advisors at Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") were assisting with the Board seat process.

45.     In addition, Papaefthymiou sent a proposed agreement prepared by Fried Frank that disclosed for the first time that Mangrove's Board seat was conditioned on a so-called "standstill agreement" and that Mangrove's director would need to step down upon the company's listing onto a major exchange.  In response, Mangrove asked, in an e-mail sent on May 25, 2017, why it would need to relinquish its Board seat, and Papaefthymiou responded via e-mail as follows:

> Navios is excited to have Mangrove on the board and looks forward to developing a sterling working relation and building a great company together.
>
> I wanted to follow up on our email exchange of last week.  There seemed to be some misunderstanding about the structure of the board, which I think has been cleared up.  To make sure, I composed the following note:
>
> At its ***initial*** board meeting held in connection with the offering, ***the board of the Company will vote to expand its size from six to seven members and to appoint Brian [Greene, Mangrove's Board nominee,] as a director***.  The board will then consist of three insiders and four independents, of which Brian would be one.  (A six member board is subject to deadlock, so we viewed such a board as provisional).
>
> In connection with Brian's appointment to the Board, ***Mangrove Partners will become subject to customary standstill provisions (prohibiting***

> *Mangrove Partners and affiliates from acquiring additional securities, participating/funding any proxy fight, acting in concert with other parties, submitting any shareholder proposal or bringing litigation against the Company or any of its directors or officers) and customary non-disparagement (prohibiting Mangrove Partners and affiliates from disparaging the Company or any of its directors or officers).* These provisions would remain in effect until Mangrove Partners' interest in the Company falls below 5%, but for at least three years. Brian will step down from the Board when Mangrove Partners' interest in the Company falls below 5%.
>
> If this meets with your approval, please acknowledge by confirming in a return email.

(emphases added).

46.     On May 31, 2017, the Secretary of Navios Containers, Papaefthymiou, contacted Mangrove to discuss the company's "initial" Board meeting, the Board seat promised to Mangrove, and the treatment of minority shareholders.  During that call, Mangrove explained that it had concerns about entering into a "standstill agreement" that would prevent it from challenging related-party transactions and protecting minority shareholder rights.  On that call, and consistent with Frangou's representations, Papaefthymiou assured Mangrove that all shareholders would be protected and all Board members had a "fiduciary duty to treat minorities well," and that Navios Containers would not do anything to "screw over minorities." Papaefthymiou also stressed the importance of moving quickly because there was an opportunity to purchase ships at favorable prices and the opportunity could be lost.  Mangrove still questioned why a standstill was needed, and Papaefthymiou explained that its legal advisors at Fried Frank were assisting with the "initial" and upcoming Navios Containers Board meeting and could answer questions regarding the standstill agreement.  A Partner at Fried Frank sent an e-mail to Mangrove to set a time to discuss on June 1, 2017.  Neither Papaefthymiou nor Fried

Frank disclosed that Defendants intended to adopt a plan of conversion or approve a partnership agreement at the claimed "initial" Board meeting.

47.     Between May 3 and June 1, 2017, Mangrove had multiple exchanges with representatives of Navios Containers (including Frangou, Navios Containers' CFO, Navios Containers' Secretary, Fearnley, and Fried Frank).  None of them disclosed any plan to strip fiduciary duties in the future or that Defendants planned to adopt a plan of conversion before the closing of Mangrove's investment.

48.     While Defendants delayed Mangrove's closing by asking Mangrove to give up shareholder rights through the proposed standstill agreement, Defendants closed private placements with all other investors, each of which was a Navios Containers insider, by May 31, 2017.

49.     On June 7, 2017—the eve of Mangrove's closing, and completely unbeknownst to Mangrove—Defendants ***purportedly*** adopted resolutions approving a plan to convert Navios Containers into a limited partnership organized under the laws of the Republic of the Marshall Islands *upon the completion of an IPO* (the "Plan of Conversion").  On that same day, Defendants claim they also adopted a partnership agreement, but the purported agreement was never provided or disclosed to Plaintiffs in connection with their investments.  On June 7, 2017, Defendants claim that all then-existing shareholders also unanimously approved the Plan of Conversion.  Defendants claim this Plan of Conversion also included a provision that Defendants would not need to seek approval from future shareholders as to the conversion, the partnership agreement, or any amendments to the Plan of Conversion.  And again, all of the existing shareholders as of June 7, 2017 were entities affiliated with or controlled by Frangou.  The claimed Plan of Conversion purportedly provides that Defendants approved stripping fiduciary

duties in connection with a conversion that would occur in conjunction with an IPO and purported to eliminate the requirement for any further shareholder approval.

50.     On the same day, and completely unbeknownst to Mangrove, Navios Containers also purportedly entered into a variety of related-party agreements, including:

- a Management Agreement dated June 7, 2017 (the "Management Agreement") with Navios Shipmanagement Inc. (the "Manager") pursuant to which the Manager provides commercial and technical management services for Navios Containers' vessels;

- an Administrative Services Agreement with the Manager to provide bookkeeping, audit and accounting, legal and insurance, administrative and clerical, banking and financial, advisory, client, investor relations, and other services;

- an Omnibus Agreement with Navios Acquisition, Navios Holdings, Navios Partners, Navios Midstream and Navios Partners Containers Finance Inc., and Navios Containers Finance; and

- a Stock Purchase Agreement with Navios Partners and Navios Partners Containers Inc., a wholly-owned subsidiary of Navios Partners.

51.     The May 2017 Investor Materials were not updated to reflect these material changes.  Nor did Defendants otherwise disclose to Mangrove that any corporate action had been taken on June 7, 2017—much less that Defendants were actively in the process of adopting a purported Plan of Conversion and a Limited Partnership Agreement that would bind both Navios Containers and future shareholders, like Plaintiffs.

52.     Frangou and the other Defendants knew that their claimed June 7, 2017 actions were material, and they concealed those purported actions while simultaneously pressuring Mangrove to invest millions of dollars and assuring Mangrove that fiduciary duties would remain in place.  Indeed, in its October 2018 prospectus statement, Navios Containers repeatedly identifies the material "Risk Factors" that resulted from Defendants' June 7, 2017 actions, such as:

- "Our general partner and its affiliates own a significant interest in us and have conflicts of interest and limited fiduciary and contractual duties, which may permit them to favor their own interests to your detriment."

- "Our partnership agreement limits our general partner's and our directors' fiduciary duties to our unit holders and restricts the remedies available to unit holders for actions taken by our general partner or our directors."

- "Fees and cost reimbursements, which the Manager determines for services provided to us, represent a significant percentage of our revenues, are payable regardless of profitability and reduce our cash available for distributions and repurchases of common units."

Amendment No. 5 to Form F-1 Registration Statement of Navios Maritime Containers, L.P., dated October 19, 2017.

53.     These risks were known by Frangou and the other Defendants no later than June 7, 2017, when Defendants approved the creation of the very risks disclosed.  Critically, however, none of the materials prepared for the private placements ever disclosed the existence of the Plan of Conversion, much less the material risks that Defendants knew at the time and subsequently disclosed in public filings.  And while Defendants hid the purported existence of the June 7, 2017 actions from Mangrove, Defendants disclosed them to the insider investors that participated in the May 2017 private placement.  In other words, Defendants selectively disclosed this information to Navios Containers insiders but not Mangrove.

54.     On June 8, 2017, one day after Defendants purportedly adopted the Plan of Conversion and took other undisclosed actions, Mangrove's $5 million private placement closed.  Mangrove reduced its anticipated investment from $20 million to $5 million because of the open Board seat issue.

**B.     August 2017 Private Placement.**

55.     In August 2017, Navios Containers began marketing a second private placement offering to New York investors, including Plaintiffs Mangrove and 683 Capital.

-19-

56.     In August 2017, Frangou traveled to New York and sent Plaintiffs another set of investor materials ("August 2017 Investor Materials").  Frangou followed the same script that she used to induce Mangrove to invest in the May 2017 private placement.

57.     For example, the August 2017 Investor Materials tracked the same representations made in the May 2017 Investor Materials.   Defendants continued to make the same representations:

- Touting Navios Containers' "Governance and transparency," citing a "[l]ong track record of financial reporting, compliance and *investor accountability in public markets*";

- Citing "[m]ultiple efficient paths to liquidity," including "[r]eturning capital to shareholders through distributions";

- Touting Navios Containers' management team, which included four independent directors (out of 6 total seats), including an "investor appointee";

- Representing that Navios Containers' affiliate relationships would result in "[o]perating costs significantly lower than average due to in-house operations";

- Claiming "[c]ommercial and technical management" at rates approximately "5% below the industry average."

58.     Despite having purportedly adopted a Plan of Conversion on June 7, 2017, the August 2017 Investor Materials said nothing about any Plan of Conversion.  The August 2017 Investor Materials continued to claim that there was only a mere "intention" to list on a reputable exchange in the future.  Those materials also continued to claim that Frangou and the other Defendants merely "preferred" a master partnership structure, they did not disclose that Defendants purportedly had already entered into a partnership agreement.  In addition, Frangou continued to represent that fiduciary duties would remain in place and that Plaintiffs would be able to participate in discussions about the future plans proposed by Defendants.

59.     Critically, Frangou and the other Defendants did not disclose or mention that they had purportedly already adopted a Plan of Conversion or settled on a partnership agreement that would strip fiduciary duties in connection with any future conversion and public stock listing. Nor did Defendants disclose that Plaintiffs would have no rights to vote for or against the claimed future plans to pursue an IPO, much less that the concealed Plan of Conversion would be forced upon them and they would no longer be protected by any fiduciary duties.

60.     On approximately August 29, 2017, Navios Containers closed a follow-on private placement.  Based on the representations made by Frangou and the other Defendants, Mangrove invested approximately $5 million and 683 Capital invested approximately $7.5 million in exchange for stock in Navios Containers.

**C.     November 2017 Private Placement.**

61.     After successfully convincing both Plaintiffs to invest millions of dollars, in October 2017, Frangou and the other Defendants set a plan in motion to induce Plaintiffs to invest in a third private placement.  Frangou and the other Defendants sent another set of investor materials to Plaintiffs ("October 2017 Investor Materials") that tracked the materials used in May and August 2017.  Frangou and the other Defendants, once again, advanced similar representations.  For example, Defendants continued to represent that Navios Containers was a corporation formed under Marshall Islands law, which imposes fiduciary duties on all corporate directors.  Defendants continued to represent that there was an "intention" to list on a reputable stock exchange.  However, Defendants modified the prior slide decks that claimed Navios Containers only had a "preferred" master partnership structure:  The October 2017 Investor Materials omitted the word "preferred" and instead provided that the "[c]onversion into MLP structure to occur in connection with exchange listing."

62.     Defendants did not disclose that they had purportedly adopted a Plan of Conversion or a form Limited Partnership Agreement on June 7, 2017.  Nor did Defendants disclose that any fiduciary duties would be eliminated in connection with a potential future conversion or that Plaintiffs would have no ability to vote for or against any plan to convert in connection with a potential future exchange listing.

63.     In addition, the October 2017 Investor Materials included a slide titled "Summary of Recent Developments," identifying the June 2017 private placement, the August 2017 follow-on private placement, the registration of Navios Containers' stock on the Norwegian OTC market; each Navios Containers vessel acquisition; and each Navios Containers bank debt financing transaction.  Defendants purposefully concealed any information regarding the claimed June 7, 2017 Plan of Conversion.

64.     Relying on the representations made by Frangou and the other Defendants, on approximately November 9, 2017, Mangrove invested approximately $5 million and 683 Capital invested $2.5 million in the third private placement in exchange for additional Navios Containers stock.

65.     On December 31, 2017, Defendants sent to Plaintiffs a year-end corporate summary for 2017.  That 12-page summary discussed events from the inception of Navios Containers (April 28, 2017) through the end of the year, including the company's acquisition of ships, its financial results, and the private placements.  No mention was made of any purported Plan of Conversion or the form Limited Partnership Agreement adopted on June 7, 2017.  Again, Defendants purposefully concealed that information.

D.      **The Failed IPO.**

66.      In March 2018, Navios Containers filed a private Draft Registration Statement with the Securities and Exchange Commission, which expressly referenced the contemplated IPO.  Defendants did not share with or send the private Draft Registration Statement to Plaintiffs.

67.      Between March and September 2018, Navios Containers filed four separate amendments to the Draft Registration Statement—all of which contemplated an IPO, and outlined the details surrounding the offering, including an anticipated IPO price of $19 per share.  Again, Defendants did not share with or send to Plaintiffs any of those amendments to the Draft Registration Statement.  Although the purported Plan of Conversion purportedly adopted on June 7, 2017, is referenced in those amendments, Defendants never attached the Plan of Conversion itself—even though they attached other referenced materials, such as various loan agreements, facility agreements, an omnibus agreement, a management agreement with amendments, and various supplemental agreements.

68.      In or around October 2018, Navios Containers—led by Frangou—abandoned the IPO in favor of a Direct Listing on the Nasdaq stock exchange.  Even though proceeding with a direct listing in the face of a failed IPO would harm the interests of shareholders and provide no benefits to Navios Containers, Frangou insisted on moving forward with the Direct Listing.

69.      In or around October 2018, Plaintiffs learned of the Direct Listing and expressed their opposition, forecasting the disastrous impact it would have on Navios Containers' share price given the lack of market support for the IPO just months earlier.  Efforts by Mangrove and other shareholders to prompt the company's board to consider alternatives and to consider the devastating harm that would result from the Direct Listing failed.

70.      On November 30, 2018—one day before filing the final Registration Statement—Navios Containers' Secretary, Papaefthymiou, filed with the SEC an Amended and Restated Plan

of Conversion and filed it with the SEC.  That purported Amended and Restated Plan of Conversion was the first time Defendants disclosed the purported contents of the Plan of Conversion that they claimed was approved on June 7, 2017.  Plaintiffs never received—much less approved—the June 7, 2017 Plan of Conversion.  In fact, Plaintiffs still have not received a copy of the purported June 7, 2017 Plan of Conversion, despite expressly requesting a copy in connection with Plaintiffs' statutory and contractual information rights.  Similarly, Defendants never disclosed the November 30, 2018 Amended and Restated Plan of Conversion before the Direct Listing.  Nor did Defendants obtain or even seek the approval of Navios Containers' shareholders for the November 30, 2018 Plan of Conversion or the Direct Listing.

71.     The November 30, 2018 Amended and Restated Plan of Conversion claims in its recitals that:

A.     The Company was incorporated under the laws of the RMI on April 28, 2017.

B.     A conversion of a corporation incorporated under the laws of the RMI into a limited partnership organized under the laws of the RMI may be made under Section 133 of the BCA and Section 25 of the LPA.

C.     In June 2017, the Board of Directors of the Company (the "Board"), unanimously adopted resolutions (the "Resolutions"), approving the conversion of the Company into a limited partnership organized under the laws of the RMI (the "Conversion"), and the terms of the Former Plan of Conversion, and the related form of limited partnership agreement to govern the affairs of the Partnership (as defined below) and the conduct of its business after the effective time of the Conversion, and recommended that the shareholders of the Company vote to approve and adopt the Conversion, the terms of the Former Plan and the related form of partnership agreement.

D.     Also in June 2017, in accordance with Section 133 of the BCA and Section 25 of the LPA, the holders of all of the outstanding shares of capital stock of the Company voted to approve and adopt, and Navios Maritime Holdings Inc., a RMI corporation and a shareholder of the Company that, will or does wholly own a subsidiary (such subsidiary and each successor, the "General Partner"), that will be the general partner of the Partnership (as defined below) from and after the effective time of the

Conversion, approved, the Conversion, the terms of the Former Plan and the related form of partnership agreement.

E.      The Former Plan, as approved by the Board and the holders of all outstanding shares on June 7, 2017, authorizes the Board to amend or abandon the Former Plan without the need for third party consent, including from shareholders.

F.      The Board has determined that it is in the best interests of the Company that the listing of the Common Units (as defined below) and the Conversion be effected through an underwritten, primary issuance and sale of Common Units and, accordingly determined to amend and restate the Former Plan and to amend the related form of limited partnership to accommodate the underwritten, primary issuance and sale of Common Units and to effect certain other desirable amendments.

72.      Based on the purported November 30, 2018 Amended and Restated Plan of Conversion, Defendants ignored Plaintiffs' objections because they claimed the June 7, 2017 Plan of Conversion authorized the "Board to amend or abandon the Former Plan without the need for third party consent, including from shareholders."    Navios Containers Am. & Rest. Plan of Conversion dated November 30, 2018.

73.      Ignoring the objections of Plaintiffs, who owned approximately fifteen percent of the company, Defendants proceeded with the Direct Listing and the conversion of the Navios Containers' outstanding common shares into common units of Navios Maritime Containers, L.P., which was formed as a Marshall Islands limited partnership.  The partnership agreement adopted in connection with the conversion was not previously disclosed to Plaintiffs and it stripped the fiduciary duties owed to shareholders, which was entirely inconsistent with Defendants' prior representations.

74.      To effectuate the Direct Listing, Navios Containers shares were listed and sold in December 2017 at an opening share price of $4.00 per share—the default minimum bid price for listing shares on the Nasdaq exchange and less than a quarter of the $19 per share IPO price that

-25-

had been advertised just months earlier.  Within days of the Direct Listing and the stripping of fiduciary duties, the initial $4 stock price dropped thirty percent in the first week and more than fifty percent in the first three months.  The consequences of proceeding with the Direct Listing, conversion, and removal of shareholder protections were obvious.  However, Defendants were motivated by different reasons—namely to strip fiduciary duties owed to minority shareholders so they could engage in improper transactions designed to funnel money to affiliated entities.

75.    In connection with the conversion, the Board appointed Navios Maritime Containers GP LLC—an affiliated and wholly-owned subsidiary of Navios Holdings that is controlled by Frangou—to serve as the general partner of Navios Containers (the "General Partner").  In addition, and as further described below, Frangou entrenched herself and her cohorts on Navios Containers' Board and ensured, through the terms of the Limited Partnership Agreement, that she would maintain firm control of Navios Containers' activities moving forward.

**E.    Defendants Either Hid or Belatedly Manufactured the Plan of Conversion.**

76.    Under applicable RMI law (referenced in the Amended Plan of Conversion itself), to convert Navios Containers into a limited partnership, the Navios Containers' Board was required to:  (i) adopt a Board resolution approving the conversion; (ii) issue a recommendation for approval to the corporation's shareholders; (iii) submit the Board resolution for approval *at an annual or special meeting*; (iv) submit a notice of the meeting to shareholders, by mail, *at least 20 days prior to the meeting*; and (v) obtain approval of **one hundred percent** of the outstanding shares, voting or non-voting.  RMI section 133 provides:

> Conversion of domestic corporation to other entities.
>
> (1) A domestic corporation of the Marshall Islands may, upon the authorization of such conversion in accordance with this section, convert

to a limited liability company, partnership, limited partnership or trust of the Marshall Islands.

(2) The board of directors of the corporation which desires to convert under this section shall adopt a resolution approving such conversion specifying the type of entity into which the corporation shall be converted and recommending the approval of such conversion by the shareholders of the corporation. *Such resolution shall be submitted to the shareholders of the corporation at an annual or special meeting. Due notice of the time, and purpose of the meeting shall be mailed to each holder of stock, whether voting or nonvoting, of the corporation at the address of the shareholder as it appears on the records of the corporation, at least twenty (20) days prior to the date of the meeting. At the meeting, the resolution shall be considered and a vote taken for its adoption or rejection. If all outstanding shares of stock of the corporation whether voting or nonvoting shall be voted for the adoption of the resolution* the corporation shall file with the Registrar of Corporations a certificate of conversion executed in accordance with section 5 of this Act, which certifies: (a) the name of the corporation and if it has been changed, the name under which it was originally incorporated. (b) the date of filing of its original articles of incorporation with the Registrar of Corporations. (c) the name of the limited liability company, partnership, or limited partnership into which the corporation shall be converted; and (d) that the conversion has been approved in accordance with the provisions of this section. . . .

Marshall Islands Business Corporations Act § 133 (emphasis added).

77. Under RMI section 133, Defendants were obligated to go through a multi-step process to secure approval of a plan of conversion. For example, the Board must adopt a resolution approving the conversion and then give notice to shareholders at least twenty days prior to the meeting. In addition, the recommended conversion can be approved only "[i]f all outstanding shares of stock of the corporation whether voting or nonvoting shall be voted for the adoption of the resolution."

78. In May 2017, Defendants were actively soliciting Mangrove to invest in Navios Containers.

79. Defendants claim in the November 30, 2018 Amended and Restated Plan of Conversion that the Navios Containers Board adopted a resolution recommending the adoption

of a plan of conversion on June 7, 2017.  On that *same day*, according to the November 30, 2018 Amended and Restated Plan of Conversion, all then-existing shareholders purportedly approved the original plan unanimously.

80.     But RMI section 33 requires a *twenty-day waiting period* between the Board approving the conversion and the holding of any shareholder vote regarding a conversion.  If Defendants had complied with the twenty-day wait period, the shareholder vote regarding the conversion should have occurred after Mangrove invested in the company, meaning that Mangrove would have had a veto right with respect to the conversion.  Defendants claim that they adopted the Plan of Conversion ***one day*** before Mangrove became a shareholder—even though it had agreed to participate in the private placement the month before.

81.     What's more, after promising Mangrove a Board seat, Defendants purposefully added new conditions to the Board position that they knew Mangrove would not accept, which further delayed Mangrove's investment in the company and gave Defendants additional time to secretly adopt a purported Plan of Conversion prior to Mangrove's investment.

82.     Plaintiffs have made multiple requests for information regarding the claimed Plans of Conversion.  Defendants have refused to produce a single document, including the purported original Plan of Conversion.  Given the lack of information, the claimed timing of the June 7, 2017 original Plan of Conversion relative to the three private placements, the failure to file the original June 7, 2017 Plan of Conversion with the SEC and failure to comply with RMI law, Plaintiffs allege that in June 2017:  (i) no valid Board resolution was passed approving the conversion; (ii) no valid Board recommendation was submitted to the corporation's shareholders; (iii) no annual or special meeting occurred between May 2, 2017 and June 7, 2017, as required to vote on the Board's recommendation; (iv) no mailed notice was issued to Navios Containers

shareholders regarding any vote; and (v) there was never a formal shareholder vote in which all shareholders elected to approve the proposed Plan of Conversion.

83.     Similarly, while the November 30, 2018 Amended and Restated Plan of Conversion claims that it was accomplished with Board consent and in accordance with the claimed June 7, 2017 Plan of Conversion, it makes no mention of any formal Board meeting, notice of any such meeting or Board vote regarding the plan.  Nor does the November 30, 2018 Amended and Restated Plan of Conversion indicate that the Board of Directors performed any diligence to inform themselves regarding the benefits or harms associated with proceeding with a direct listing following a failed IPO, which would trigger a conversion of the company into a new structure with no fiduciary duty protections.  Notwithstanding the drastic nature of an entity conversion and significance of listing with the SEC, Navios Containers conducted no investigation or due diligence and instead blindly proceeded with the Direct Listing at the direction of Frangou.

84.     Despite being repeatedly referenced in Navios Containers' SEC filings as an anticipated attachment to Navios Containers' draft prospectus statement, the purported original June 7, 2017, Plan of Conversion was never attached.  Instead, an "Amended and Restated Plan of Conversion" purportedly executed on November 29, 2018—one day before Navios Containers' final prospectus statement—was filed with the SEC on November 30, 2018.

85.     Accordingly, based on information and belief, Defendants never actually adopted the Plan of Conversion on June 7, 2017.  And Plaintiffs only learned of the existence of that purported original Plan of Conversion after November 30, 2018—when the Amended and Restated Plan of Conversion was filed.

**F.      The Direct Listing Was Done To Benefit Frangou.**

86.      The Board's election to proceed with the Direct Listing and related conversion has conferred substantial benefits to Frangou and Navios Containers' affiliates—which are also controlled by Frangou—to the detriment of Navios Containers' shareholders.  The Direct Listing and the resulting conversion removed any accountability that Frangou and her Board constituents previously had by restricting the duties owed through the 2018 conversion to a limited partnership and the adoption of the limited duties owed in the Limited Partnership Agreement.

87.      At the direction of Frangou, Defendants inserted a variety of provisions into the Limited Partnership Agreement post-conversion that effectively entrenched and transferred complete control of Navios Containers to Frangou and her hand-selected constituents.   The Board accomplished this through Limited Partnership Agreement provisions (i) transferring to the General Partner sole discretion over the appointment of three of the seven Board seats; (ii) providing that the remaining four directors would be elected *by a plurality* of the votes of the Outstanding Common Units, which ensured that Frangou and Navios Holdings would be able to select at least one of the four Elected Directors and guarantee Board control; and (iii) allowing the Elected Directors to be removed, at any time and without cause, by the affirmative vote of a majority of the other members of the Board.

88.      At the direction of Frangou, Defendants took steps to ensure that minority shareholders (such as Plaintiffs) could not unwind these onerous and oppressive restrictions by requiring the approval of more than seventy-five percent of Outstanding Units—and Frangou owns or controls more than twenty-five percent of the Units.

89.      In connection with soliciting the investments of Mangrove and 683 Capital, Navios Containers stated that much of its income would be paid to investors as dividends post-conversion, touting the preferred tax treatment for dividends in a partnership as the reason for the

conversion.  However, while the conversion occurred more than seventeen months ago, Navios Containers has failed to issue any of the promised dividend payments to investors.  There was no reasonable basis to move forward with the Direct Listing.

90.    In addition, Navios Containers has squandered assets by entering into artificially inflated and unreasonable agreements with affiliates controlled by Frangou, which contain outlier terms that are more favorable to the affiliates than industry standard.  Such conduct is especially alarming in light of Navios Containers repeatedly touting to investors that its economies of scale result in "~5% lower operating expenditures than the industry."

91.    One of those deals is Navios Containers' Management Agreement, pursuant to which Navios Containers compensates the Manager—an entity affiliated with and controlled by Frangou—for its provision of commercial and technical management services to Navios Containers' vessels.  Although the Management Agreement requires that such services be provided in a commercially reasonable manner, Navios Containers has siphoned off significant funds by charging inflated fees that are above standard industry rates and grossly exceed the "~5% lower operating expenditures than the industry" promised to investors.  The Management Agreement further authorizes the Manager to subcontract certain commercial and technical management services to other Navios Holdings subsidiaries, enabling further abuse through subcontracts with additional Frangou affiliates.  Under this payment scheme, an entity affiliated with Frangou received more than $65 million and $53 million in management fees, respectively, in 2019 and 2018 alone.

92.    Moreover, in August 2019, Navios Containers increased the benefits being transferred to the Manager by entering into an amendment to the Management Agreement, despite the lack of *any* legitimate business purpose or justification to amend the agreement.  The

term of the Management Agreement covered an initial period of five years *and included an automatic extension for five-year periods thereafter unless a notice for termination is received by either party*.  Thus, barring the Manager terminating the Management Agreement, it would have continued in perpetuity under its prior terms.  And even if termination were to occur, the Management Agreement's initial term was not set to expire for almost two years, on June 7, 2022.  Moreover, the amended Management Agreement introduced an egregious termination fee, which would pay the Manager more than $65 million upon termination.  Both the post-termination expiration period and the termination fee fly in the face of market standards, which typically would call for an expiration period of merely a few months, and a fee of approximately $5 million.  Thus, in an act that can only be explained as blatant self-dealing, Frangou and her controlled-Board approved an amendment to the Management Agreement that (i) extended the minimum term of the agreement, (ii) increased the management fees owed by Navios Containers, and (iii) injected an entirely new termination fee on Navios Containers equal to *an entire year's worth of management fees*.  For reference, the management fees paid in just the first nine months of 2019 totaled $48.9 million.  By comparison, Navios Containers' market cap as of June 19, 2020 was $27.62 million.  In fact, Navios Containers even states in its most recent annual report that the fees paid to the Manager are a risk factor that may adversely impact shareholders: "If we desire to terminate either of these agreements before its scheduled expiration, we must pay a termination fee to the Manager as per management agreement.  As a result, our ability to make short-term adjustments to manage our costs by terminating one or both these agreements may be limited which could cause our results of operations and ability to pay cash distributions and repurchases of common units to be materially and adversely affected."

93.     Not only has the amendment dramatically increased Navios Containers' exposure in the event of termination; it provides for the payment of added fees that the company was previously under no obligation to pay, resulting in the additional diversion of assets out of Navios Containers.  While Navios Containers was previously scheduled to pay a daily fee of US $6,100 for containerships from 3,000 TEU up to 5,500 TEU and $7,400 for containerships from 8,000 TEU up to 10,000 TEU, it now must pay, over the same-two year period, (a) $6,215 daily rate per Container vessel of 3,000 TEU up to 4,999 TEU—an increase of $125 per day; and (b) $7,780 daily rate per Container vessel of 8,000 TEU up to 9,999 TEU—an increase of $380 per day.  It also implemented a daily fee of $50 per vessel, which amounts to over $500,000 per year in extra compensation to the Manager for no additional work.  By contrast, the amendment conveys no meaningful consideration to Navios Containers.

94.     After completing the amendment to Navios Containers' Management Agreement—in which the management fees to be paid by Navios Containers were substantially increased and a termination fee nearly double Navios Containers' market capitalization was inexplicably added—Navios Holdings entered into a Purchase Agreement with N Shipmanagement Acquisition Corp. (another Frangou-affiliated entity) and related entities (together, "NSAC").  Pursuant to the Purchase Agreement, whereby NSAC agreed to purchase the entities comprising Navios Holding's ship management division, the general partner interest in Navios Containers, and Navios Maritime Containers GP, LLC—the entity serving as Navios Containers' General Partner.  Accordingly, NSAC acquired complete control over (i) Navios Containers, through its General Partner interest, and (ii) Navios Containers' management company, which receives substantial funds from Navios Containers in the form of the recently inflated management fees.

95.    Although no public information is available regarding NSAC's ownership structure, the SEC filings of Navios Containers and its affiliates, which are signed by Frangou, routinely characterize NSAC as a company "affiliated with the Company's Chairman and Chief Executive Officer," Angeliki Frangou.  Accordingly, Frangou—through her affiliated entities, jointly defined as "NSAC"—has acquired *de facto* control of Navios Containers.

96.    Navios Containers has similarly contracted with other entities affiliated with and controlled by Frangou—for example, through an Administrative Services Agreement and an Omnibus Agreement.  Based on information and belief, these agreements likewise contain payment obligations and other provisions that are substantially more onerous on Navios Containers than standard industry terms. For example, the Administrative Services Agreement contains a termination fee as well, which Navios Containers has stated publicly is equal to the fees charged for the full calendar year preceding the termination date.  However, to fully assess the scope and extent of this practice of diverting Navios Containers' assets through sweetheart deals, Plaintiffs need access to the books and records requested in Plaintiffs' books and records demands, which Defendants have repeatedly and improperly rejected in their entirety.

## G.    Frangou Hid Her Involvement with Criminal Proceedings.

97.    Defendants touted the importance of Frangou during the private placements and how her involvement was critical.  Based on Plaintiffs' investigation, Frangou has been the subject of at least one criminal investigation in recent years, including an investigation by special corruption prosecutors that led to Frangou's bank accounts being frozen in or around November 2018—approximately one month before the Direct Listing and conversion.  Moreover, according to publicly available publications and based on information and belief, Greek authorities brought felony charges against Frangou in connection with an alleged money laundering racket and

potential corrupt practices in 2016.  None of these matters—much less the criminal charges—were ever disclosed to Plaintiffs during the private placements.

**H.     Plaintiffs' Books and Records Demands.**

98.     On December 4, 2019, Plaintiffs' counsel served a demand letter on Navios Containers seeking targeted information, consistent with the requirements of both the Marshall Islands Limited Partnership Act and Navios Containers' Limited Partnership Agreement.  For example, Plaintiffs requested that Navios Containers provide the following information:

- Documents sufficient to show a complete record or list of the Partnership's unit holders, showing the name and address of each unit holder and the number of units registered in the name of each such unit holder (a) as of the date of this letter (the "Current Date"), and (b) as of November 30, 2018 (the "Conversion Date").

- Copies of all written partnership agreements for the Partnership (including all exhibits and attachments thereto), all certificates of limited partnership for the Partnership, and all amendments to those documents.

- With respect to the Partnership and any entities it controls or operates, any annual reports, audited or unaudited financial statements, and general ledgers.

- With respect to the Partnership and any entities it controls or operates, all agreements or contracts involving any affiliates, including Navios Maritime Acquisition Corporation, Navios, Navios Maritime Partners L.P., Navios Maritime Midstream Partners, L.P., Navios South American Logistics, Inc., Special Purpose Vehicles Navios Europe I & II, Navios Maritime Holdings Inc., or Ms. Angeliki Frangou.

- With respect to the Partnership, its General Partner, and the Predecessor, all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with any review, action, decision, vote, determination, or proposal concerning the conversion of the Predecessor into the Partnership.

- With respect to the Partnership, its General Partner, and the Predecessor, all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with any review, action, decision, vote, determination, or proposal concerning the listing of equity interests in the

Partnership on the Nasdaq or any other exchange through any method other than an IPO ("Direct Listing"), including any materials provided or prepared by investment banks or financial advisors and proposed engagement terms or underwriting fees for a Direct Listing.

- With respect to the Partnership, its General Partner, and the Predecessor, all documents or correspondence concerning payments of distributions or dividends by the Partnership to any limited partners, unit holders, or affiliates of the Partnership or any shareholders or affiliates of the Predecessor.

99.     A true copy of Plaintiffs' demand letter dated December 4, 2019 is attached hereto as **Exhibit A** and incorporated herein by reference.

100.     Given the limited time period involved, Plaintiffs' requests would not have resulted in any undue burden on Navios Containers.  Nevertheless, before filing suit, Plaintiffs offered to address any issues concerning any undue burden but Navios Containers never raised any such concerns and instead objected because it claimed there was no basis for seeking the information.

101.     By letter dated December 12, 2019, Navios Containers, through its counsel at Fried Frank, refused to comply with Plaintiffs' demand for inspection.

102.     On January 13, 2020, in an effort to avoid litigation and at the request of Navios Containers' counsel, Plaintiffs sent a second letter to Navios Containers detailing examples of the factual circumstances supporting Plaintiffs' concerns about the company's mismanagement and breaches of legal duties.

103.     By letter dated January 27, 2020, Navios Containers again rejected Plaintiffs' demand for inspection, refusing to provide a single document in response.

104.    On February 19, 2020, Plaintiffs sent a third letter to Navios Containers seeking information concerning certain criminal matters involving Frangou and requesting that Navios Containers produce documents relating to:

- Criminal investigations, allegations, or charges brought against Angeliki Frangou or any entities owned by, in whole or in part, or affiliated with Angeliki Frangou from January 2015 to the present (collectively, the "Criminal Matters").

- With respect to Navios, its General Partner, or Navios Maritime Containers, Inc., all meeting minutes, resolutions, board or committee packages, presentations, reports, or any other materials reviewed, considered or relied upon in connection with or relating to any review, action, decision, vote, resolution, determination, or proposal concerning the Criminal Matters.

105.    A true copy of Plaintiffs' demand letter dated February 19, 2020 is attached hereto as **Exhibit B** and incorporated herein by reference (together with Plaintiffs' December 4, 2019 demand letter to Navios Containers, the "Demand Letters").

106.    On March 3, 2020, six days after Navios Containers' response deadline had expired and after Plaintiffs were forced to send another letter prompting a response, Navios Containers sent a letter categorically refusing to produce any materials responsive to Plaintiffs' third demand letter or any of the requests previously submitted.

107.    Plaintiffs' counsel also had multiple conversations with counsel for Navios Containers and repeatedly asked to discuss the documents demands to address any issues regarding scope or burden. Defendants and their representatives have declined to confer by phone about the document demand themselves.

108.    The Demand Letters complied with the form and manner requirements under Section 32 of the Marshall Islands Limited Partnership Act and Section 3.4 of the Limited Partnership Agreement. The Demand Letters were made under oath, included proof of Plaintiffs' beneficial ownership of Partnership interests and were signed under oath.

109.    Moreover, the Demand Letters set forth proper purposes reasonably related to Plaintiffs' interests as limited partners of Navios Containers.  Specifically, the Demand Letters state eight proper purposes, each of which is valid:

- Investigating potential wrongdoing, mismanagement, and breaches of fiduciary duties by members of the Board, executive officers, the General Partner, and others in connection with the events, circumstances, and transactions described above;

- Investigating the scope and extent of the conflicts of interest that may have contributed to the events, circumstances, and transactions described above;

- Valuing Navios and its respective units;

- Determining whether the Amended and Restated Plan of Conversion and Direct Listing were properly presented to the Board for approval and, if so, whether the Board issued formal approval and properly discharged its duties of due care and loyalty in considering those actions;

- Valuing the synergies and relative benefits to Navios's affiliates and related companies that resulted or was forecasted from the Predecessor's use of a Direct Listing;

- Assessing the ability of Navios's Board to consider, impartially, a demand for action (including a request for permission to file a derivative lawsuit on Navios's behalf) related to the items described in the Demand and this response letter;

- Performing the appropriate actions in the event that the members of the Board did not properly discharge their fiduciary duties, including the preparation and filing of a shareholder lawsuit; and

- Investigating the determinations, if any, by the Predecessor, Navios, the Board, executive officers, the General Partner, any committee or sub-committee, or others concerning whether the Conversion, Amended and Restated Plan of Merger, or Direct Listing were fair to and in the best interests of the relative constituencies including the Predecessor, its shareholders, Navios, and its converted unitholders, as well as the basis for such determinations.

110.    In short, there is ample basis to support Plaintiffs' Demand Letters. The Board's misguided decisions and lack of diligence associated with pursuing the Direct Listing, the Board's disregard of the shareholder-approved Plan of Conversion and breach of Defendants'

representations to potential investors, and Frangou's and the General Partner's continued mismanagement post-conversion, including the use of self-interested deals through which Navios Containers' assets are being diverted into affiliated entities, all support the conclusion that serious concerns exist regarding mismanagement of Navios Containers, which justifies further investigation into the matters specified in the Demand Letters.

111.    Moreover, the discrete categories of documents requested by Plaintiffs directly relate to Plaintiffs' proper purposes for inspection.  For example, with respect to their proper purpose of investigating the scope and extent of Navios Containers' and Board's conflicts of interest, Plaintiffs seek copies of Navios Containers' agreements with affiliated entities and documents concerning payments to affiliates or shareholders of affiliates.  With respect to the proper purpose of investigating whether any Plan of Conversion or Direct Listing was approved or properly considered or in the best interests of shareholders, Plaintiffs seek the materials reviewed, considered, or relied upon by the Board's directors concerning those matters.  With respect to their proper purpose of valuing their interests, Plaintiffs seek Navios Containers' financial statements and general ledgers.  In sum, each of the categories of information sought by Plaintiffs is narrowly tailored to a proper purpose and should be made available by Navios Containers.

112.    Accordingly, Plaintiffs seek an order requiring Navios Containers to produce all of the requested documents so that Plaintiffs can, among other things, properly evaluate the suitability of directors, the Board's prior conduct (including any wrongdoing or mismanagement), the criminal allegations involving Frangou, the Board's diligence and decisions regarding those criminal allegations and the various transactions described herein, and communicate about those issues with other Partnership investors.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF SECTION 10(B) AND RULE 10B-5
*(Securities Fraud Claims against Navios Containers, Frangou and Doe Defendants 1-10)*

113.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as if fully stated herein.

114.    This federal securities fraud claim is asserted against Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

115.    The Supreme Court has interpreted Section 10(b) and Rule 10b-5 expansively to "capture a wide range of conduct," as "the securities laws were designed 'to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *see Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

116.    Section 10(b) and its implementing regulations serve the overriding goal of preventing fraud, whether the improper conduct is "a garden type variety of fraud, or present[s] a unique form of deception," and "[n]ovel or atypical methods should not provide immunity from the securities laws." *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 11 n. 7 (1971) (quoting *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir.1967)).  Indeed, "Section 10(b) was designed as a catchall clause to prevent fraudulent practices." *Chiarella v. United States*, 445 U.S. 222, 226 (1980).

117.    "[T]he basic purpose behind these laws," therefore, is "'to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Lorenzo*, 139 S. Ct. 1103 (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

118.    Rule 10b-5 provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

      a.      To employ any device, scheme, or artifice to defraud,

      b.      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

      c.      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see Lorenzo,* 139 S. Ct. at 1096; *VanCook v. S.E.C.*, 653 F.3d 130, 138 (2d Cir. 2011).

119.    Section 10 of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly to employ, in connection with the purchase or sale of any security "any manipulative or deceptive device or contrivance" in contravention of any rule the SEC may prescribe. 15 U.S.C. § 78j.  Under Second Circuit precedent, "[t]his broad language, on its face, extends to manipulation of all kinds, whether by making false statements or otherwise." *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008).  So, for example, "misleading" statements as well as "false" statements can violate these securities laws.  *Lorenzo*, 139 S. Ct. at 1100.  The Supreme Court has said that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"  *Affiliated Ute*, 406 U.S. at 151.

120.    At the time of each private placement, the directors of Navios Containers—which was a Marshall Islands Corporation at the time of Defendants' investment solicitations—owed fiduciary duties as a matter of law.  As a threshold matter, such duties are owed by the

management of a Marshall Islands corporation as a default rule. *See* Marshall Islands Business

Corporations Act § 28.  Moreover, Marshall Islands corporations are statutorily precluded from

eliminating several key fiduciary duties, which the Marshall Islands Business Corporations Act

describes as follows:

> [T]he articles of incorporation may also contain a provision for elimination or limitation of personal liability of a director, provided that such provision shall not eliminate or limit the liability of a Director:
>
> (i)     any breach of the director's duty of loyalty to the corporation or its shareholders;
>
> (ii)    for acts or omissions not undertaken in good faith, misconduct or a knowing violation of law; or
>
> (iii)   for any transaction from which the director derived an improper personal benefit.  No liability of a director for any act or omission occurring prior to the date when such provision becomes effective.

*Id*.

121.    Under RMI law and during the private placements, the officers and directors of

Navios Containers were subject to the duty of loyalty, duty to act in good faith, duty to avoid any

knowing violation of the law, and duty to not to engage in any transaction that would result in an

improper personal benefit, among others.  Marshall Islands Business Corporations Act § 28(m).

Similarly, in a Marshall Islands limited partnership, the default rule is that all partners owe

fiduciary duties to one another.

122.    The governing Marshall Islands law further provides that in order to legally

effectuate a conversion from a corporation into a limited partnership, like that at issue here,

Defendants were required to:  (i) adopt a Board resolution approving the conversion; (ii) issue a

recommendation for approval to the corporation's shareholders; (iii) submit the Board resolution

for approval at an annual or special meeting; (iv) submit a notice of the meeting to shareholders,

by mail, at least 20 days prior to the meeting; and (v) obtain approval of one-hundred percent of the outstanding shares, as alleged above. *Id*. § 133.

123.   Here, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a deliberate fraud and deceit upon Plaintiffs; made various untrue, deceptive, and manipulative statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud, deceive, and manipulate Plaintiffs in connection with the purchase and sale of securities.

124.   Defendants engaged in their schemes with "'intent to deceive, manipulate, or defraud.'" *Lorenzo*, 139 S. Ct. at 1100 (quoting *Aaron v. SEC*, 446 U.S. 680, 686 & n.5 (1980)).

125.   Defendants' schemes were intended to and did: (i) deceive Plaintiffs (ii) artificially inflate and maintain the stock price of Navios Containers; (iii) cause Plaintiffs to purchase or otherwise acquire Navios Containers' stock at inflated prices and terms that they would not have entertained, and certainly not purchased, if the full truth had been made available to them.  In furtherance of this unlawful scheme, plan and course of conduct, each Defendant took the actions set forth herein.

126.   As alleged herein, and pursuant to this scheme, plan, and unlawful course of conduct, Defendants knowingly and recklessly issued, caused to be issued, and/or otherwise participated in the preparation and issuance of deceptive, manipulative, and materially false and misleading representations and material omissions to Plaintiffs concerning the fiduciary duties, management accountability, strategy and intent, and affiliate agreements of Navios Containers during the investor solicitations leading up to Plaintiffs' various private placement investments in

2017; deceptively withheld material information regarding the existence and scope of the proposed Plan of Conversion; falsely and deceptively portrayed the descriptions of fiduciary duties, shareholder protections and affiliated agreements as being truthful, accurate and complete; falsely and deceptively represented that no significant corporate governance changes had occurred since the initial private placement was offered on May 3, 2017; and then conducted multiple follow-on private placements while deliberately concealing the transactions that purportedly occurred in June 2017, despite having disclosed those material transactions to inside investors, with the intent to defraud and deceive Plaintiffs into purchasing Navios Containers securities that Plaintiffs would not have purchased on full information.

127.    When they made their false statements and committed their omissions, Defendants knew facts or had access to information suggesting that their public and investor-facing statements were not accurate or recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.  Indeed, Frangou purports to have personally reviewed and approved each of the agreements and resolutions on June 7, 2017, but nevertheless concealed each of those material transactions throughout all three of the private placements.  Moreover, Defendants engaged in selective disclosure regarding many of these material facts, for example, disclosing the June 7, 2017 Plan of Conversion, form Limited Partnership Agreement, and various affiliate agreements to Navios Containers' insider investors while simultaneously concealing that information from Plaintiffs.

128.    Defendants had a duty to speak completely and truthfully about Navios Containers, its corporate governance, shareholder protections, and the other material matters discussed in soliciting investors and a duty to correct and update prior misstatements and statements that had become misleading, including their misrepresentations regarding the true

scope, strength, and intent of Navios Containers' shareholder protections, the conversion, and the intended removal of the fiduciary duties owed.

129.    Defendants directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false, misleading, deceptive, and manipulative statements of material false and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not deceptive and misleading; either made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud, deceive, and/ manipulate in connection with the purchase or sale of securities.

130.    As described herein, Defendants acted with scienter in committing the wrongful acts and omissions alleged herein in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein (or acted with reckless disregard for the truth in that she failed to ascertain and disclose the true facts) even though such facts were available to Defendants.  Defendants knew that their representations and omissions were either false or materially misleading because they (i) personally participated in the purported negotiation, execution, and approval of the fraudulently concealed June 7, 2017 Plan of Conversion, form Limited Partnership Agreement, and related-party agreements; (ii) selectively disclosed those transactions to the Navios insider investors participating in the May 2017 Private Placement; (iii) nevertheless concealed the material information and transactions from outside investors, such as Plaintiffs; (iv) tellingly disclosed the concealed information and transactions only after completing all rounds of private outside investment; (v) expressly confirmed their understanding that the concealed information was material when subsequently identifying the transactions and

their terms as material risk factors in subsequent SEC filings; and (vi) engaged in transactions containing terms well outside of industry standards with entities affiliated with and controlled by Frangou that would otherwise be prohibited by the previously stripped shareholder protections.

131.    Defendants were motivated to commit wrongful acts by the tens of millions of dollars they were able to raise through the various private placements described herein by withholding certain material information.

132.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs relied, to their detriment, on such misleading statements and omissions in purchasing Navios Containers shares.

133.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud, deceive, and manipulate Plaintiffs; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their investments in Navios Containers.

134.    Plaintiffs purchased shares in Navios Containers that they would not have purchased or otherwise acquired at the prices they paid, or at all, if Plaintiffs had been aware of Defendants' materially false and misleading statements and/or omissions of material facts.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases or acquisitions of Navios Containers stock.  Plaintiffs have lost millions of dollars due to the Defendants' fraudulent conduct.

135.   Plaintiffs were further damaged by Defendants' concealment and subsequent disclosure of Defendants' intent to both eliminate the shareholder protections previously in place to protect minority shareholders, such as Plaintiffs, and do so in connection with a Direct Listing, contrary to Defendants' prior representations.  Once this information became publicly available, Navios Containers' share price plummeted as a result.

### COUNT TWO:  COMMON LAW FRAUD
*(against Navios Containers, Frangou and Doe Defendants 1–10 under New York law)*

136.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as if fully stated herein.

137.   Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997); *Sotheby's, Inc. v. Stone*, 388 F. Supp. 3d 265, 274 (S.D.N.Y. 2019); *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011).

138.   Here, Defendants induced Plaintiffs to purchase millions of dollars in Navios Containers common shares through fraud and fraudulent concealment.

139.   Specifically, as particularized above, Defendants knowingly and recklessly issued, caused to be issued, and/or otherwise participated in the preparation and issuance of the following deceptive and materially false and misleading representations and material omissions to Plaintiffs concerning the fiduciary duties, management accountability, strategy and intent, and affiliate agreements of Navios Containers during the investor solicitations leading up to Plaintiffs' various private placement investments in 2017; deceptively withheld material

Case 1:20-cv-02290-LJL   Document 18   Filed 07/20/20   Page 48 of 55

information regarding the existence and scope of the proposed Plan of Conversion; falsely portrayed the descriptions of fiduciary duties, shareholder protections and affiliated agreements as being truthful, accurate and complete; and falsely represented that no significant corporate governance changes had occurred since the initial private placement was offered on May 2, 2017. Defendants then conducted several follow-on private placements while deliberately concealing the transactions that purportedly occurred in June 2017, despite having disclosed those material transactions to inside investors.

140. When they made their false statements and committed their omissions, Defendants knew facts or had access to information suggesting that their public and investor-facing statements were not accurate or recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements. Indeed, Frangou purports to have personally reviewed and approved each of the agreements and resolutions on June 7, 2017, but nevertheless concealed each of those material transactions throughout all three of the private placements. Moreover, Defendants engaged in selective disclosure regarding many of these material facts, for example, disclosing the June 7, 2017 Plan of Conversion, form Limited Partnership Agreement, and various affiliate agreements to Navios Containers' insider investors while simultaneously concealing that information from Plaintiffs.

141. Defendants had a duty to speak completely and truthfully about Navios Containers, its corporate governance, shareholder protections, and the other material matters discussed in soliciting investors and a duty to correct and update prior misstatements and statements that had become misleading, including their misrepresentations regarding the true scope, strength, and intent of Navios Containers' shareholder protections, the conversion, and the intended removal of the fiduciary duties owed.

-48-

142.    Defendants directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material false and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; either made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities.

143.    As described herein, Frangou acted with intent to defraud in committing the wrongful acts and omissions alleged herein in that had actual knowledge of the misrepresentations and omissions of material facts set forth herein (or acted with reckless disregard for the truth in that she failed to ascertain and disclose the true facts) even though such facts were available to Frangou.

144.    Defendants were motivated to commit wrongful acts by the tens of millions of dollars they were able to raise through the various private placements described herein by withholding certain material information.

145.    Plaintiffs reasonably relied upon the false representations made by Defendants by purchasing shares in Navios Containers that they would not have purchased or otherwise acquired at the prices they paid, or at all, if Plaintiffs had been aware of Defendants' materially false and misleading statements and/or omissions of material facts.

146.    As a direct and proximate result of their reliance upon the false representations and omissions of Defendants, Plaintiffs have suffered damages, including investment losses, and Defendants, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the

form of improper and unearned fees and payments directed to affiliated entities controlled by Defendants.  Under the circumstances, Defendants should be required to pay damages or return the $25 million invested by Plaintiffs and surrender any ill-gotten profits.

**COUNT THREE:  WRONGFUL REFUSAL TO PRODUCE BOOKS AND RECORDS**
*(Claim for Breach of the Limited Partnership Agreement against Navios Containers)*

147.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as if fully stated herein.

148.    Plaintiffs—both of which are shareholders of Navios Containers and have been unit holders of Navios Containers at all times relevant to the allegations and claims in this Complaint—made demands to inspect certain books and records of Navios Containers for purposes reasonably related to their interests as limited partners.

149.    Pursuant to Section 3.4 of the Limited Partnership Agreement, Plaintiffs are entitled to review Navios Containers' books and records upon written request stating any purpose reasonably related to Plaintiffs' interests as unit holders of Navios Containers.

150.    Section 3.4 of the Limited Partnership Agreement provides, in relevant part, that:

(a)     In addition to other rights provided by this Agreement or by applicable law, and except as limited by Section 3.4(b), each Limited Partner shall have the right, for a purpose reasonably related to such Limited Partner's interest as a Limited Partner in the Partnership, upon reasonable written demand and at such Limited Partner's own expense, to:

(i)      have furnished to him a current list of the name and last known business, residence or mailing address of each Partner;

(ii)     obtain true and full information regarding the amount of cash and a description and statement of the Net Agreed Value of any other Capital Contribution by each Partner and which each Partner has agreed to contribute in the future, and the date on which each became a Partner;

        (iii)     have furnished to him a copy of this Agreement and the Certificate of Limited Partnership and all amendments thereto, together with a copy of the executed copies of all powers of attorney pursuant to which this Agreement, the Certificate of Limited Partnership and all amendments thereto have been executed;

        (iv)     obtain true and full information regarding the status of the business and financial condition of the Partnership Group; and

        (v)     obtain such other information regarding the affairs of the Partnership as is just and reasonable.

    (b)     The Board of Directors may keep confidential from the Limited Partners, for such period of time as the Board of Directors deems reasonable,

        (i)     any information that the Board of Directors reasonably believes to be in the nature of trade secrets or

        (ii)     other information the disclosure of which the Board of Directors in good faith believes (A) is not in the best interests of the Partnership Group, (B) could damage the Partnership Group or (C) that any Group Member is required by law or by agreement with any third party to keep confidential (other than agreements with Affiliates of the Partnership the primary purpose of which is to circumvent the obligations set forth in this Section 3.4).

Navios Containers Limited Partnership Ag. § 3.4.

    151.    Pursuant to Section 32 of the Marshall Islands Limited Partnership Act, Plaintiffs are similarly entitled to review Navios Containers' books and records upon written request, stating any purpose reasonably related to Plaintiffs' interests as unit holders of Navios Containers.

    152.    Section 32 of the Marshall Islands Limited Partnership Act provides, in relevant part, that:

> Each limited partner has the right, subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners, to obtain from the general partners from time to time upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner: (i) true and full information regarding the status of the business and financial condition of the limited partnership; (ii) promptly after becoming available, a copy of the limited partnership's financial statements or income tax returns, if applicable, for each year; (iii) a current list of the name and last known business, residence or mailing address of each partner; (iv) a copy of any written partnership agreement and certificate of limited partnership and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the partnership agreement and any certificate and all amendments thereto have been executed; (v) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each partner and which each partner has agreed to contribute in the future, and the date on which each became a partner; and (vi) other information regarding the affairs of the limited partnership as is just and reasonable.

Marshall Islands Limited Partnership Act § 32(2)(a).

153.    The Marshall Islands Limited Partnership Act further provides that it "shall be applied and construed to make the laws of the Marshall Islands, with respect to the subject matter hereof, uniform with the laws of the State of Delaware of the United States of America" and that "[i]insofar as it does not conflict with any other provision of this Act, or the decisions of the High and Supreme Courts of the Republic of the Marshall Islands which takes precedence, the non-statutory law of the State of Delaware is hereby adopted as the law of the Marshall Islands." *Id*. § 66(5).

154.    The documents identified in the Demand Letters fall within the scope of Section 3.4 of the Limited Partnership Agreement and Section 32 of the Marshall Islands Limited Partnership Act, and Plaintiffs have complied fully with all requirements under both the Limited

Partnership Agreement and the Marshall Islands Limited Partnership Act concerning the form and manner of making a demand for inspection of Navios Containers' books and records.

155.    Through their Demand Letters, Plaintiffs have identified a credible basis from which to infer that there are reasonable grounds to suspect mismanagement that warrants further investigation.  Plaintiffs' Demand Letters stated purposes reasonably related to their interests as unit holders of Navios Containers, and the documents identified therein are essential for that purpose.  In addition, Plaintiffs have offered to pay any reasonable, statutorily prescribed costs associated with their demands.

156.    Navios Containers has wrongfully, and in bad faith, refused to provide Plaintiffs access to *any* of the books and records requested in their Demand Letters, depriving Plaintiffs of their inspection rights and in the process breaching the Limited Partnership Agreement and violating the Marshall Islands Limited Partnership Act.

157.    Plaintiffs are therefore entitled to apply to this Court for an order compelling inspection of Navios Containers' corporate books and records.

158.    Moreover, because Defendant's outright refusal to produce any of the documents requested by Plaintiffs pursuant to their information rights under the Limited Partnership Agreement and Marshall Islands law was in bad faith, Plaintiffs are entitled to an award of all reasonable and necessary attorneys' fees incurred in prosecuting their books and records demand.

159.    Plaintiffs seek an order based on Section 3.4 of the Limited Partnership Agreement and Section 32 of the Marshall Islands Limited Partnership Act directing Navios Containers to produce the requested records.

160.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiffs pray for the following:

A.      That judgment be entered in their favor on alleged claims.

B.      That Defendants be ordered to pay Plaintiffs' damages, fees and expenses to compensate them for all harm caused by their unlawful conduct, including punitive damages.

C.      An award of legal fees and costs.

D.      Any other relief that the Court deems just and appropriate, including rescission resulting in the return of the $25 million invested by Plaintiffs and disgorgement of ill-gotten profits by Defendants.

DATED:  July 20, 2020

Respectfully submitted,

BAKER BOTTS LLP


By: *Brian C. Kerr*
     BRIAN C. KERR
     BAKER BOTTS LLP
     30 Rockefeller Plaza
     New York, New York 10112
     (212) 408-2500
     brian.kerr@bakerbotts.com

OF COUNSEL:

NAVI SINGH DHILLON (*pro hac vice* forthcoming)
BAKER BOTTS LLP
101 California Street
San Francisco, California 94111
(415) 291-6200

DANNY DAVID (*pro hac vice* forthcoming)
SCOTT KELLER (*pro hac vice* forthcoming)
EVAN A. YOUNG (*pro hac vice* forthcoming)
JUSTIN LIPE (*pro hac vice* forthcoming)
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234

*Counsel for Plaintiffs*